**UNITED STATES of America, Plaintiff,**

v.

**KAISER AETNA et al., Defendants.**

**Civ. No. 73-3864.**

United States District Court, D. Hawaii.

Feb. 6, 1976.

Harold M. Fong, U. S. Atty., Stephen D. Quinn, Asst. U. S. Atty., Honolulu, Hawaii, for plaintiff.

R. Charles Bocken, Damon, Shigekane, Key & Char, Honolulu, Hawaii, for Kaiser Aetna & Hawaii Kai Development Co.

G. Richard Morry, Conroy, Hamilton, Gibson, Nickelsen & Rush, Honolulu, Hawaii, for Trustees of the Bernice P. Bishop Estate.

## DECISION

PENCE, District Judge.

The United States, for its Corps of Engineers, asks for a declaratory judgment and injunctive relief, seeking a declaration that the waters of Kuapā Pond, now more generally known as Hawaii-Kai Marina, are navigable waters of the United States, and that defendants must obtain authorization from the Corps for any future construction, excavation or filling in the marina, in accordance with § 10 of the Rivers and Harbors Act, 33 U.S.C.A. § 403 (1970). Plaintiff also requests that this court enjoin the defendants from interfering in any way with public access to the waters of the marina as well as mandate defendants to publicize that fact.

Hawaii-Kai Marina is situated wholly on property owned in fee simple by defendant Bishop Estate. In 1967 the Estate leased the property within which was Kuapā Pond to Kaiser-Aetna interests, which began dredging and filling the pond in order to create the present marina, now a part of a larger and surrounding development known as Hawaii-Kai.

Plaintiff asserts that the marina is navigable water of the United States under two alternative theories: Kuapā Pond was navigable in its natural state and did not lose that status by dint of the subsequent development, or the subsequent development by defendants rendered the pond navigable. The Corps informed Kaiser-Aetna in 1972 that it considered the pond to be navigable water, whereupon the defendants applied for § 10 permits without admitting the navigability of Kuapā Pond.

Defendants deny that the pond is a navigable water of the United States and also raise several affirmative defenses: First, prior to 1972 the Corps did not require permits because it considered the waters to be private, thereby creating a form of estoppel to this action; second, a governmental declaration that the waters of the marina are public navigable waters of the United States is a taking of private property for public use without just compensation, in violation of the Fifth Amendment; third, since the quality of the marina waters will be harmed by public use, the administrative determination that the waters are navigable is a major federal action significantly affecting the human environment, for which the Corps has failed to file an environmental impact statement under 42 U.S.C.A. § 4332(2)(C) (1973).

Due to the potential impact of the resolution of the legal issues of this case upon numerous other fishpond properties in Hawaii,[1] the court invited parties with interests in other ponds to appear as *amici curiae*. The case was tried without a

---

1. Kuapā Pond was used as a fishpond prior to development, as more fully set forth later in the decision. The Corps of Engineers compiled a list of 142 fishponds throughout the state.

jury upon stipulations by the parties, submission of exhibits, and testimony of witnesses.

## FINDINGS OF FACT

### I. *The pre-development fishpond*

Kuapā Pond covered 523 acres and extended approximately 2 miles inland from Maunalua Bay and the Pacific Ocean on the island of Oahu, Hawaii. The pond was contiguous to Maunalua Bay, the latter being navigable water of the United States.

A not uncommon barrier beach delineated Kuapā Pond from the bay. The area probably was a stream mouth prior to the end of the ice age, at which time the rise in sea level caused the shoreline to retreat from a position that is now submerged by Maunalua Bay, and is marked by the reef edge. Partial erosion of the headlands adjacent to the bay formed sediment which accreted to form the barrier beach at the mouth of the pond, creating a lagoon.

Early Hawaiians used that lagoon as a fishpond and reinforced the natural sand bar with stone walls where the tidal flows in and out of the ancient lagoon occurred. Approximately two-thirds of the pond's water came from the sea. Runoff waters from the surrounding mountains provided the balance. Part of the seawater present in the pond percolated through the barrier beach. As indicated above, for the area's use as a fishpond the barrier was incomplete in its normal state. Wave and tidal action from the sea and occasional heavy fresh water flow breached the sand barrier and allowed the ocean tides to flood the pond.

Recorded history prior to annexation of Hawaii and geological evidence indicate two openings from the pond to Maunalua Bay. The fishpond's managers placed removable sluice gates in the stone walls across these openings. During high tide, water ·from the bay and ocean entered the pond through the gates. During low tide, the current flow reversed toward the ocean.

The Hawaiians utilized the tidal action in the pond to raise and catch fish, primarily mullet.[2] During ebb tides, the sluice gates allowed water but not large fish to escape, thus "flushing" and enriching the pond while preserving the crop. Water depths in the pond varied up to 2 feet at high tide. Large areas of land at the inland end were completely exposed at low tide. The fishermen harvested the pond with the aid of shallow-draft canoes or boats, but the barrier beach and stone walls prevented boat travel directly therefrom to the open bay.

Kuapā Pond, with other Hawaiian fishponds, have always been considered to be private property by landowners and by the Hawaiian government. Most fishponds were built behind barrier beaches, such as Kuapā Pond, or immediately seaward of the land controlled by the *alii*, or chiefs.[3] By imposing a tabu on the taking of the fish from a pond, the chief alone determined the allotment, if any, of fish, just as he distributed the other crops among his sub-chiefs, land agents, and vassals. The fishpond was thus an integral part of the Hawaiian feudal system. Chiefs gave land, including its fishponds, to sub-chiefs, or took it away at will. Any fishponds in conquered chiefdoms became the personal property of the conquering high chief and were treated in the same manner the high chief treated all newly subjugated lands and appurtenances. The

2. Although some small fry entered the pond with the tidal flux, Hawaiian aquaculture depended upon seeding the pond with fry caught in nearby bays, because mullet spawns only in seawater, not in the brackish water of the pond.

3. A *loko kuapa* is a fishpond of littoral water created by construction of a stone wall across a side or sides facing and having access to the sea. When what is primarily a barrier-beach type pond needs a stone wall to separate the pond from sea action it is referred to as a loko kuapā. Such was Kuapā Pond.

commoner had no absolute right to fish in the ponds, nor in the sector of ocean adjacent to the chief's land—all of such rights were vested in the chiefs and ultimately in the king, alone.

In 1848, King Kamehameha III pronounced the Great Mahele, or national land distribution. Any fishponds therein were allotted as part or inholding of the *ahupuaa* (a land/water unit). Titles to fishponds were recognized to the same extent and in the same manner as rights were recognized in fast land. Kuapā Pond was within the land of a Royal Patent, pursuant to the Great Mahele, with title eventually vesting in Bernice Pauahi Bishop and thence in defendant Bishop Estate.

During the early 1900's, Kalanianaole Highway was constructed upon and along the sand bar which separated Kuapā Pond from Maunalua Bay and the Pacific Ocean. Coral fill was placed on top of the sand bar to provide a foundation for the highway. Highway bridges were made over the waterways between the two sluice gates of Kuapā Pond and the bay. Always, until 1961, Kuapā Pond was solely used as a fishpond.

As indicated above, at all times the pond area was subject to the ebb and flow of the tides, excepting only any restraints created by the sluice gates.

II. *Post-development characteristics*

In 1961 the Bishop Estate gave Kaiser-Aetna interests master subdivision housing-development rights to a 6,000 acre area known today as Hawaii-Kai. The lease included the Kuapā Pond area, and the agreement contemplated that Kaiser-Aetna would dredge and fill parts of the pond, erect retaining walls, and build bridges within the development to create what is now the Hawaii-Kai Marina. Upon notice to the Corps of Engineers, defendants were told that no permits were needed for their proposed developments and operations within Kuapā Pond.

Later, Kaiser-Aetna notified the Corps that it planned to improve the Kalanianaole Highway bridge to a maximum clearance of 13.5 feet over mean sea level, and dredge a channel below it to a depth of 8 feet, to allow boats from the marina to enter into and return from the bay, as well as to provide better drainage of the marina waters. The Corps acquiesced in the developers' proposals,[4] its chief of construction commenting only that the "deepening of the channel may cause erosion of the beach."[5]

Construction of the Hawaii-Kai subdivision and marina proceeded as planned and there are now approximately 22,000 residents therein. The average depth of the marina is now 6 feet, with a main channel of 8 feet. Since development of the marina, 668 boats have been registered and authorized to use the pond. Kaiser-Aetna oversees the operations of the marina and has generally excluded all "commercial" vessels, although it has not yet decided whether or not businesses in the shopping center that abuts the marina may operate commercial vessels.

Kaiser-Aetna owns and operates a small vessel within the marina, the "Marina Queen", which can carry up to 25 persons. During 1967–72, Kaiser-Aetna operated the Marina Queen primarily to show Hawaii-Kai to possible subdevelopers and purchasers of homes or homesites. On Sundays, they invited the general public to join the cruises. During 1973, the marina shopping center merchants' association took over operation of the Marina Queen. The ship ran six or seven times a day for the purpose of attracting people to the marina shoreside and adjoining shopping facilities. As a part of the general promotion, Kaiser-

---

4. The record indicates no response to a letter from D. M. Snow, Project Engineer for Kaiser-Aetna, to the Corps of Engineers (Defendants' Exhibit 15) which stated: "It is our understanding that no separate federal permit will be required for this construction, and that there will be no requirement for public use or control of any waters on the Kuapā Pond side of the bridge."

5. Defendants' Exhibit 14.

Aetna chartered buses to pick up tourists at various points in Waikiki and transport them to the marina area. The tourists were given a special package of shop discounts and a ride on the Marina Queen, for which they paid $1 and later $2 per person for the package. During this period, 18,254 tourists and a total of 38,821 persons rode the Marina Queen. The boat ride was available without charge to anyone who came to the marina.

The promotion ended in early 1974, and Kaiser-Aetna now uses the Marina Queen for promotion of real estate sales and for school groups on request. The Marina Queen has operated at all times solely within the waters of the marina.

Every marina-lot lessee has a non-exclusive easement with the trustees of Bishop Estate, which still owns the fee, for purposes of navigation across Kuapā Pond and access to Maunalua Bay. Approximately 1,500 lots front the marina, and their lessees pay $72 annually for maintenance of the pond.[6] In addition, at least 86 Hawaii-Kai but non-marina lot lessees pay $72 annually for boating privileges of the marina, and 56 boat owners who are not residents of the Hawaii-Kai subdivision pay the same fee for the right to moor their boats in the marina and travel across it into Maunalua Bay.[7]

Since the channel connecting the marina and the bay is unobstructed, the marina waters are subject to the ebb and flow of the tides.

## CONCLUSIONS OF LAW

### I. Introduction

■ The concept of "navigable waters" grew out of the "public common of piscary," i. e., the right of the common people of England to travel upon the waters and to fish them. Under English common law, the Crown owned the beds of all navigable waters affected by the ebb and flow of the tide. *Martin v. Waddell's Lessee,* 41 U.S. (16 Pet.) 367, 411–13, 10 L.Ed. 997 (1842). When the American Revolution took place, the states succeeded to all rights and powers of the Crown. Thus they held title to the beds and control over public use of all navigable waters within their respective boundaries.

■ Upon ratification of the Constitution, jurisdiction over the surface of navigable waters used in interstate commerce passed to the federal government under the Commerce Clause. Jurisdiction over the surface of navigable waters lying wholly within a single state, and not connecting with other waters to form a navigable highway of interstate commerce, remained with the situs state. *Id.* at 410, 10 L.Ed. 997.

■ Subject to exceptions to be discussed below, the same federal-state rights of jurisdiction and title generally applies to states admitted to the Union after the original 13, the underlying theory being that the United States acquired lands and held them in trust for future states so that they could be admitted on an equal footing with the original states. *Pollard's Lessee v. Hagan,* 44 U.S. (3 How.) 212, 11 L.Ed. 565 (1845).

■ The term "navigability" has many legally distinct applications. (1) It may determine *title* to river and lake beds.[8] (2) It has been the touchstone of

---

6. Natural accretion tends to block up the artificial channels. Development dredging ended in 1970. During 1972–73 the first maintenance dredging took place at a cost of $160,000 to the defendants.

7. Subsequent to the trial, the court requested that defendants provide information about use of the marina by nonresidents. They submitted it in the form of a post-trial stipulation of facts, into which plaintiff refused to enter. The court accepts the declaration of defend-

ants as the Court's Exhibit 1 over plaintiff's objection, as an admission against interest.

The proposed post-trial stipulation also indicates that 86 non-marina lot lessees are using the pond rather than 175. While the government did not agree to the stipulation, the court will accept the "86" figure as a minimum number.

8. *United States v. Chicago, M., St. P. & P. R. Co.,* 312 U.S. 592, 596, 61 S.Ct. 772, 85 L.Ed. 1064 (1941); *Gilman v. Philadelphia,* 70 U.S. (3

Congressional *jurisdiction* over waters via the Commerce Clause.[9] (3) It embodies the *navigation servitude,* a modern declaration of the common law right of public access to the surface of waters. In addition, (4) admiralty jurisdiction in federal courts flows from the general concept of navigability.[10] The use of the term "navigability" for these four purposes, however, does not necessarily mean that each is co-extensive with the other. *See United States v. Appalachian Electric Power Co.,* 311 U.S. 377, 408, 61 S.Ct. 291, 85 L.Ed. 243 (1940). Therefore any reliance upon judicial precedent must be predicated upon careful appraisal of the *purpose* for which the concept of "navigability" was invoked in a particular case. In this suit, plaintiff is seeking a determination that the Hawaii-Kai Marina is within Congressional jurisdiction as exercised and implemented by the Rivers and Harbors Act, and that the waters of the marina are subject to the navigation servitude.

## II. *Navigability of Kuapā Pond in its natural state*

If Kuapā Pond was navigable water of the United States prior to its development by defendants, such development would not have destroyed that status, absent a specific Congressional abandonment of the waters, and the marina would, unquestionably be subject to the public's right of access. *See Economy Light & Power Co. v. United States,* 256

Wall.) 713, 724–25, 18 L.Ed. 96 (1865). *Utah v. United States,* 403 U.S. 9, 91 S.Ct. 1775, 29 L.Ed.2d 279 (1971).

9. *Arizona v. California,* 283 U.S. 423, 454–57, 51 S.Ct. 522, 75 L.Ed. 1154 (1931) (the navigation power sustains Congressional authorization of the Hoover Dam); *United States v. Appalachian Electric Power Co.,* 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940) (federal power to license private hydroelectric projects); *United States v. Grand River Dam Auth.,* 363 U.S. 229, 80 S.Ct. 1134, 4 L.Ed.2d 1186 (1960) (approving federal flood control project on nonnavigable tributary because it is related to flood control on navigable streams).

10. *The Propeller Genesee Chief v. Fitzhugh,* 53 U.S. (12 How.) 443, 13 L.Ed. 1058 (1851).

U.S. 113, 124, 41 S.Ct. 409, 65 L.Ed. 847 (1921).

## A. *Tests of navigability*

Of the several tests of navigability for purposes of public access to surface waters in the United States, the most common one had its genesis in cases dealing with admiralty jurisdiction and the Commerce Clause power.[11] The pronunciamento in *The Daniel Ball,* 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1870), while not involving seawaters, is generally applied: "Those rivers must be regarded as public navigable rivers in law which are navigable in fact." Anent that statement, one expert has observed that "a navigable river is any river with enough water in it to float a Supreme Court opinion."[12] Although Kuapā Pond floated shallow-draft boats for fishing purposes, one crucial element of the government's case was certainly missing prior to the transformation of the pond into the Hawaii-Kai Marina, viz., navigation in *interstate* commerce.[13] There is no evidence that the barrier beach and the pond's stone walls ever admitted the possibility of even the shallowest boats floating directly from Kuapā Pond to the open bay.

The government, however, maintains that the principle established in *United States v. Appalachian Electric Power Co., supra,* applies here, viz., that a waterway must also be considered to be navigable in law if reasonable im-

11. *Propeller Genessee Chief, supra,* n. 10; *The Daniel Ball,* 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1870).

12. C. Meyers & A. Tarlock, Water Resource Management 240 (1971).

13. "And they constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water." *The Daniel Ball, supra* n. 11 at 563, 19 L.Ed. 999.

provement would render it navigable in fact.[14] Thus, an inquiry under *Appalachian* must focus on Kuapā Pond in its natural state and entail a comparison of the cost of improvement with need.[15] However, the government has presented no evidence on the subject, other than that the marina may now be or may be made susceptible to interstate commerce.[16] The mere fact that the defendants decided that it was reasonable for them to spend the money necessary to develop Kuapā Pond into a marina as a recreational body of water *adjunct* to its private residential subdivision, for the apparent purpose of enhancing the property value of homesites thereon and about, does not lead, per se, to the conclusion that it was ever financially reasonable to develop Kuapā Pond into a highway just for interstate commerce by water.

A third test of natural-state navigability has been applied in several federal *courts in recent years*,[17] viz., the "ebb and flow" test. Under this test, expressly adopted by the Third Circuit in *United States v. Stoeco Homes, Inc.*, 498 F.2d 597, 605–06, 610 (1974), estuarine tidal areas which are regularly inundated by the mean higher, high tide[18] are subject to the federal navigation servitude.

As indicated above, unquestionably the Pacific tides ebbed and flowed over Kuapā Pond in its pre-marina state. Maps and surveys, as well as the bases of fishpond aquaculture, establish that there would have been at least a minimum basis for federal jurisdiction if the ebb and flow test could be applied, because some of Kuapā Pond was *always* inundated.[19] Therefore, if it were not for the unique legal status of Hawaiian fishponds such as Kuapā Pond as strictly private property, free and clear of any claim by the Crown either to the beds thereof or the waters thereon under Hawaiian law prior to annexation, and their protection then and thereafter as such by statute and Constitution, application of the ebb and flow test would have established a public right of access to Kuapā Pond.[20]

---

14. The law of *Appalachian* does not necessarily help the plaintiff with respect to its navigation servitude claim because that case dealt only with Congressional power to assert its Commerce Clause jurisdiction for purposes of licensing private power plants. See 311 *U.S.* at 407–08, 61 S.Ct. 291.

15. As observed in *Appalachian, supra*, at 407–08, 61 S.Ct. at 299: "[T]here are obvious limits to [the cost of] such improvements as affecting navigability. These limits are necessarily a matter of degree. There must be a balance between cost and need at a time when the improvement would be useful." *See also United States v. Rio Grande Irrigation Co.*, 9 N.M. 292, 299, 51 P. 674, and 174 U.S. 690, 699, 19 S.Ct. 770, 43 L.Ed. 1136 (1899).

16. The government presented evidence, rebutted by defendants, that *further* reasonable improvements of the marina would render it susceptible to additional forms of commerce. *Appalachian* is not directly in point on any such separate second stage of improvements. To have the *Appalachian* doctrine apply, the first stage and second stage together would have to be found economically reasonable at the inception of the project.

17. *United States v. Stoeco Homes, Inc.*, 498 F.2d 597, 605–06, 610 (3d Cir. 1974); *United States v. Cannon*, 363 F.Supp. 1045 (D.Del. 1973); *United States v. Lewis*, 355 F.Supp. 1132 (S.D.Ga.1973); *United States v. Baker*, 2 E.R.C. 1849 (S.D.N.Y.1971); *cf. Zabel v. Tabb*, 430 F.2d 199 (5th Cir. 1970), *cert. denied* 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971); *Tatum v. Blackstock*, 319 F.2d 397 (5th Cir. 1963); *United States v. Joseph G. Moretti, Inc.*, 331 F.Supp. 151, 156–57 (S.D.Fla.1971). *But see Pitship Duck Club v. Town of Sequim*, 315 F.Supp. 309 (W.D.Wash.1970); *North Am. Dredging Co. v. Mintzer*, 245 F. 297 (9th Cir. 1917).

18. On the Pacific coast, the line of the mean higher, high tide is used instead of the mean high tide. *See United States v. California*, 381 U.S. 139, 175–76, 85 S.Ct. 1401, 14 L.Ed.2d 296 (1965), *modified*, 382 U.S. 448, 449–52, 86 S.Ct. 607, 15 L.Ed.2d 517 (1966).

19. Although plaintiff did not present evidence to establish the reach of the mean higher, high tide, areas that were historically always covered by water *a fortiori* are within the mean higher, high tide.

20. It cannot be doubted that where the federal government has a navigation servitude it also has jurisdiction for Commerce Clause purposes. *See* section III. A *infra*.

### B. The effect of Hawaiian property law

As indicated above, the status of fishponds from Hawaiian prerecorded history up through the Great Mahele of 1852 was clearly that of private property, appropriated by successive conquerors, and given by and to chiefs, with the commoners excluded from the lands, the pond waters and the fish therein, under every regime. The distribution of land in the Great Mahele made no change in the rights of private ownership of fishponds, as the Hawaii Supreme Court recognized in a series of pre-annexation cases.[21]

■ The Organic Act of 1900, following annexation, repealed all prior laws conferring private rights in *seawater* fisheries (subject to vested rights) but specifically exempted fishponds from its scope.[22] A similar provision appears in the Hawaii Constitution, article X, § 3. Opinions since annexation and statehood confirm the private nature of fishponds in Hawaii.[23]

The United States Supreme Court has recognized the legitimacy of similar Hawaiian property rights in sea fisheries. *See Damon v. Hawaii,* 194 U.S. 154, 24 S.Ct. 617, 48 L.Ed. 916 (1904); *Carter v. Hawaii,* 200 U.S. 255, 26 S.Ct. 248, 50 L.Ed. 470 (1906). Justice Holmes delivered both opinions; in *Damon* the learned jurist wrote:

A right of this sort is somewhat different from those familiar to the common law, but it seems to be well known to Hawaii, and, if it is established, there is no more theoretical difficulty in regarding it as property and a vested right than there is regarding any ordinary easement or *profit a prendre* as such. The plaintiff's claim is not to be approached as if it were something anomalous or monstrous, difficult to conceive and more difficult to admit. Moreover, however anomalous it is, if it is sanctioned by legislation, if the statutes have erected it into a property right, property it will be, and there is nothing for the courts to do except to recognize it as a right.

194 U.S. at 158, 24 S.Ct. at 618. While, as indicated, these cases dealt with sea fisheries and not fishponds, they constitute a federal recognition of peculiar rights arising out of Hawaii's unique feudal system of property rights.

■ The theory that the federal government holds a stewardship over all navigable water in a United States territory prior to its being admitted to statehood (see section I *supra*), may be valid for lands obtained from a foreign

21. *Haalelea v. Montgomery,* 2 Haw. 62 (1858); *In re Boundaries of Pulehunui,* 4 Haw. 239 (1879); *Kapea v. Moehonua,* 6 Haw. 49 (1871); *Harris v. Carter,* 6 Haw. 195 (1877). Private ownership was so commonly accepted under the Monarchy that the issue was not raised directly in these cases. Dictum, under these facts, enhances rather than detracts from the strength of the legal precedents.

The Board of Commissioners to Quiet Titles was concerned solely with landed property, *see Carter v. Hawaii,* 200 U.S. 255, 257, 26 S.Ct. 248, 50 L.Ed. 470 (1906), and routinely included fishponds within its land awards or patents under the Great Mahele. In those awards or patents of land wherewith a fishpond was appurtenant, either the description or accompanying map or both showed the fishpond as part of the award. Haw.Att'y. Gen.Op.No.1689, at 460 (1939). For example, Kuapā Pond was not described separately but was included within the boundaries of the Royal Patent of the Land of Maunalua certified by the Oahu Commissioner of Boundaries, June 13, 1884.

22. "All fisheries in the sea waters of the Territory of Hawaii not included in any fish pond or artificial inclosure shall be free to all citizens of the United States . . . ." 48 U.S. C.A. § 506 (1952).

23. *Murphy v. Hitchcock,* 22 Haw. 665, 669–70 (1915); *State v. Hawaiian Dredging Co.,* 48 Haw. 152, 397 P.2d 593 (1964); *Palama v. Sheehan,* 50 Haw. 298, 440 P.2d 95 (1968); Haw.Att'y.Gen.Op.No.1689 (1939); Haw.Att'y. Gen.Op.No.57–159 (1957).

*McBryde Sugar Co. v. Robinson,* 54 Haw. 174, 187, 504 P.2d 1330, 1339 (1973) (and now before this court) holding that "ownership of water in natural watercourses, streams and rivers remained in the people of Hawaii for their common good," does not apply to claims of ownership to fishponds such as Kuapā Pond.

government where there is no history of legally authorized private proprietorship over certain waters therein. Where, just as here under the Hawaiian Kingdom, property rights have been established by a government prior to purchase or annexation of the lands however, those private property rights survive if they are recognized in and by the instrument of annexation. For example, in *Knight v. United States Land Association,* 142 U.S. 161, 183–84, 12 S.Ct. 258, 35 L.Ed. 974 (1891), the federal government confirmed a title to tidelands which rested on the claim of the city of San Francisco as successor to the rights of a pueblo under a Mexican grant. The grounds for the decision were that the treaty of Guadalupe Hidalgo required the United States to protect property rights which had been created by the previous Mexican government, and in such event the doctrine of "equal footing" did not apply.[24]

■ The Act of Congress annexing the Hawaiian Islands recognized existing property rights by providing:

> The municipal legislation of the Hawaiian Islands, not enacted for the fulfillment of the treaties so extinguished, and not inconsistent with this joint resolution nor contrary to the Constitution of the United States nor to any existing treaty of the United States, shall remain in force until the Congress of the United States shall otherwise determine.[25]

Upon enacting comprehensive legislation for the governance of the territory, *i. e.,* the Organic Act, as noted *supra* Congress specifically exempted fishponds from any change in status. This same protection was placed in the Hawaii Constitution, which Congress approved as a prerequisite to admission of Hawaii into the Union.[26]

■ Kuapā Pond, therefore, was never subject to any "common right of piscary," and was never servient to any "navigation servitude;" it was always the legal equivalent of fast land for property and "navigation" purposes. Therefore, its owners had the right to exclude the public therefrom, at least and certainly until they began transforming the land (and pond) into the Hawaii-Kai subdivision development.

This court now turns to consideration of whether or not the transformation of the pond into the Hawaii-Kai Marina and its subsequent use has altered the owner's legal rights with respect to any federal control over the waters and the public use thereof.

III. *Navigability and the navigation servitude of the Hawaii-Kai Marina in its present state and use*

A. *Navigability of the Hawaii-Kai Marina*

The government's claim of interstate commercial use of the marina seems to rely primarily upon the activities of the Marina Queen. Plaintiff's theory is that tourists traveling in interstate commerce use the Marina Queen, albeit solely within the marina, as part of their journey. Any analogy to a *Yellow Cab*[27] type of

---

**24.** There is nothing inconsistent between the Hawaiian law of private ownership of fishponds and the federal power over navigation because the latter was merely a surrender of jurisdiction by the states of powers inherited from the Crown or acquired by the "equal footing" doctrine—only to the extent the states had jurisdiction over waters to surrender. The Kingdom of Hawaii never claimed jurisdiction over fishpond waters. *See* n. 21 *supra.*

**25.** Act of July 7, 1898, 30 Stat. 750–51. As stated in note 24 *supra* and elsewhere in this decision, see section I *supra,* Hawaiian law of

private ownership of fishponds is not inconsistent with the Constitution. None of the other exceptions to the recognition of existing property rights in the quoted sentence are applicable.

**26.** Act of Mar. 18, 1959, Pub.L.No.86–3, § 1, 73 Stat. 4.

**27.** *United States v. Yellow Cab Co.,* 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947) (intrastate transportation of passengers between train stations is part of the stream of interstate commerce sufficient to charge a violation of the Sherman Act).

commercial activity would be faulty, however, because in *Yellow Cab* the intrastate activity was a necessary link in an interstate chain of travel. Here it is merely a relaxing diversion that has *de minimis* impact on the interstate activities of tourists.[28]

There is other evidence, however, of current substantial use of the marina in interstate commerce. Defendants did not restrict use of the marina just to residents of Hawaii-Kai as an exclusive appurtenant to their lot purchase agreements, to permit them to launch their private recreational crafts into the marina's private waters, and enter Maunalua Bay by means of an artificial channel from the marina to the bay. Rather, Kaiser-Aetna also sells licenses to nonresidents to use the facilities of the marina for launching and mooring their boats, as well as use the marina waters as a highway by which to gain the open sea through the channel. By so doing, defendants transformed what was apparently conceived as a private recreational area into a combination harbor and canal available to any boat owner who was willing to pay the fee, subject only to the total use-capacity of the marina. Thus the marina is in fact used in interstate commerce both to raise revenue for Kaiser-Aetna and to transport residents and nonresidents by waterway into and out of Maunalua Bay.

Federal admiralty jurisdiction has long been held to apply to artificial waterways that in fact form highways of commerce between different states or into foreign commerce, over which vessels actually pass.[29] Thus a privately owned waterway may come within the term "navigable waters of the United States" as used in § 10 of the Rivers and Harbors Act if it *in fact*[30] supports interstate commerce.[31] The federal government has an intense interest in the quantity and safety of commercial traffic moving in interstate commerce, whether over natural or artificial channels, and possesses the constitutional authority to regulate the same.

It therefore follows that the waters of the marina cannot now be considered to be private property in and upon which its owners may do as they please without any possible federal regulation. As used by the defendants, the marina has become the legal equivalent of a toll-charging canal or harbor and therefore subject to regulation by the Corps of Engineers under § 10 of the Rivers and Harbors Act.

**28.** The *Yellow Cab* concept of "in commerce" has apparently never been applied by a court to establish federal commerce jurisdiction over navigation in waters artificially made navigable. *United States v. Underwood*, 344 F.Supp. 486 (M.D.Fla.1972), dealt with a waterway that apparently was navigable in its natural state as a matter of law. *Utah v. United States*, 403 U.S. 9, 91 S.Ct. 1775, 29 L.Ed.2d 279 (1971), dealt with navigability of the Great Salt Lake for title purposes. It was specifically rejected as an adequate test of interstate commerce, as Congress used the concept in the Rivers and Harbors Act, in *Hardy Salt Co. v. Southern Pacific Transportation Co.*, 501 F.2d 1156 (10th Cir. 1974).

**29.** The canal cases cited by plaintiff are not directly relevant to this court's inquiry because they deal with the scope of federal *admiralty* jurisdiction. For example, in *Ex Parte Boyer*, 109 U.S. 629, 3 S.Ct. 434, 27 L.Ed. 1056 (1884), a canal was held to be within the admiralty jurisdiction, and "public water of the United States . . . even though the canal is wholly artificial, and is wholly within the body of a State, and subject to [the State's] ownership and control . . .." *Id.* at 632, 3 S.Ct. at 435. The analogy to the question of Commerce Clause power, however, is an apt one, as the Supreme Court has noted. *See United States v. Appalachian Elec. Power Co., supra,* 311 U.S. n. 9, at 408, 61 S.Ct. 291.

**30.** The government urged a broader test of navigability, viz., susceptibility to commerce. However, the Corps of Engineers' regulations regarding navigability do not themselves adopt this test. *See* 33 C.F.R. § 209.260(g)(1)(i), (iii) (1975), and Congress has no constitutional justification for acting until the private owner puts its property to work in interstate commerce.

**31.** *Dow Chemical Co. v. Dixie Carriers, Inc.,* 330 F.Supp. 1304 (S.D.Tex.1971), *aff'd* 463 F.2d 120 (5th Cir.), *cert. denied,* 409 U.S. 1040, 93 S.Ct. 525, 34 L.Ed.2d 490 (1972). *See also* 36 Op.Att'y.Gen. 203 (1930).

This determination that the waters of the marina are subject to federal regulation, however, does not resolve all of the problems of this dispute.

### B. *Regulation versus full exercise of the navigation servitude*

■ As indicated above, the dominant federal navigation servitude arises from the common law *public* right to pass over *naturally* navigable waters.[32] Because under common law no private property right exists in such waters, therefore there is no private "right" to be "taken" by government action.

Here, however, as stated above, there never existed any public rights in or to the waters of Kuapā Pond, nor did its transformation into the present marina, by private funding, create, *ipso facto,* any *public* rights therein or thereto.

■ As indicated by The Court in *Appalachian, supra,* when nonnavigable waters, previously private, are made suitable for navigation,

> *navigability, for the purpose of the regulation of commerce, may later arise.* An analogy is found in admiralty jurisdiction, which may be extended over places formerly nonnavigable.

311. U.S. at 408, 61 S.Ct. at 300 (footnotes omitted, emphasis added).

Because it was dealing solely with Congressional power to regulate, and not with an assertion of public rights to travel on the water, the Court did not discuss the navigation servitude. The Court continued, however:

> The plenary federal power over *commerce* must be able to develop with the needs of that commerce which is the reason for its existence. It cannot

properly be said that the federal power over navigation is enlarged by the improvements to the waterways. It is merely that improvements make applicable to certain waterways the existing *power over commerce.*

*Id.* at 409, 61 S.Ct. at 300 (footnotes omitted, emphasis added).

■ *United States v. Cress,* 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746 (1917) (cited in *Appalachian*), together with *Appalachian,* clearly indicate that private "fast" lands and waters when made navigable by improvements or which could be made navigable are subject to Congressional regulation. Nevertheless while Congress may provide for the improvement and regulation of navigation, and take necessary action to prevent interference or obstruction to navigation, it cannot impose a *public* navigation servitude upon such a privately constructed waterway without paying a reasonable compensation for the use thereof.

Here then, since Kuapā Pond has been transformed into navigable waters used in commerce, the marina has therefore become subject to regulation by Congress and within admiralty jurisdiction. It does not follow, however, that the United States can, without payment, appropriate those waters for *public* use and deprive the defendants of their investment or any return on it.[33]

If the government wants the marina opened to free public use, the defendants must be paid. This the government has not done.

### IV. *Defenses*

■ Defendants argue that acquiescence by the Engineers, who did not in-

---

**32.** For an example of the difficulties attending a determination of whether waters are "naturally navigable", see *Appalachian, supra,* 311 U.S. n. 9, at 407–18, 61 S.Ct. 291.

**33.** *See also* 36 Op.Att'y.Gen. 203 (1930).

This court does not imply that it believes that the *Appalachian* Court would have required compensation if Congress had been engaged in a project to improve the New River for purposes of public travel. Recognized title

to property, or absence thereof, would be a major factor in determining the issue. The physical condition of the subject property would likewise be significant. At one extreme would be lands such as were the subject of *Cress.* At the other extreme would be a vast interstate river obstructed at only one point, by a few easily removable boulders. Compensation is required in the first case, but not necessarily in the second.

sist upon permits during the planning and development of Hawaii-Kai, should affect the resolution of this case.[34] The Corps' seeming indifference to the creation, construction and use and the potential effect thereof upon commerce does not constitute a waiver or estoppel, however, since the constitutional power of Congress over the navigable waters cannot be impaired or restricted by any officer in the executive branch of government.[35]

 Defendants claim that the National Environmental Policy Act § 102(2)(C), 42 U.S.C.A. § 4332(2)(C) (1973), requires the Corps of Engineers to issue an environmental impact statement before taking administrative action to declare the marina a navigable waterway is without merit. NEPA does not apply here. The initial declaration by the Corps merely asserted the existence of its *jurisdiction* under existing legislation, which had long ago given to the Corps the regulatory power over navigation aspects of interstate commerce. Therefore, the Corps' recognition of the scope of its authority is not an "action" within the meaning of § 102(2)(C).[36]

## CONCLUSION

The government's prayer for a declaration that Hawaii-Kai Marina is subject to § 10 of the Rivers and Harbors Act is GRANTED. The government's request for an injunction preventing defendants from denying public access to Hawaii-Kai Marina, and requiring them to noti-

fy the public of its accessibility is DENIED.

Plaintiff and defendants will submit proposed forms of the order.

---

**34.** Defendants' further argument, that the Engineers' prior lack of enforcement should limit the degree of injunctive relief available to the United States, *see United States v. Stoeco Homes, Inc.,* 498 F.2d 597, 610–11 (3d Cir. 1974), is moot because of this court's ruling, *supra,* that the federal navigation power over privately constructed artificial highways of commerce does not extend to assertion of public navigation servitude without just compensation.

**35.** *Montana Power Co. v. FPC,* 87 U.S.App. D.C. 316, 185 F.2d 491, 495 (1950), *cert. denied,* 340 U.S. 947, 71 S.Ct. 532, 95 L.Ed. 683 (1951).

**36.** The Corps' initial declaration, when contested by defendants, is not dispositive of the issue. 33 C.F.R. § 209.260(b) (1975). Final determination of the question of navigability is made by the federal courts, which are not "agencies" for purposes of NEPA. *See* 5 U.S.C.A. § 551(1)(B) (1967). Preparation of an environmental impact statement and other procedures mandated by NEPA are not prerequisites to the Corps' determination, nor this court's finding that Hawaii-Kai Marina is a navigable waterway subject to federal regulation under the Rivers and Harbors Act.