UNITED STATES of America, Plaintiff-Appellant,

v.

KAISER AETNA, Bernice P. Bishop Estate, Richard Lyman, Jr., Hung Wo Ching, Frank E. Midkiff, Matsuo Takabuki, Myron B. Thompson, Trustees of the Bernice P. Bishop Estate, Hawaii-Kai Development Co., Defendants-Appellees.

UNITED STATES of America, Plaintiff-Appellee,

v.

KAISER AETNA, Bernice P. Bishop Estate, Richard Lyman, Jr., Hung Wo Ching, Frank E. Midkiff, Matsuo Takabuki, Myron B. Thompson, Trustees of the Bernice P. Bishop Estate, Hawaii-Kai Development Co., Defendants-Appellants.

Nos. 76–2400, 76–1968.

United States Court of Appeals, Ninth Circuit.

Aug. 11, 1978.

Kathryn A. Oberly, Atty. (argued), Dept. of Justice, Washington, D.C., for the U.S.

R. Charles Bocken (argued), of Damon, Shigekane, Key & Char, G. Richard Morry (argued), of Conroy, Hamilton, Gibson, Nickelsen & Rush, Honolulu, Hawaii, for Kaiser Aetna et al.

Before MERRILL, CUMMINGS,* and SNEED, Circuit Judges.

* Honorable Walter J. Cummings, United States Circuit Judge of the Seventh Circuit Court of Appeals, sitting by designation.

MERRILL, Circuit Judge:

Cross-appeals have been taken from judgment of the district court. The United States, as plaintiff, has secured a declaratory judgment establishing that the waters of Kaupa Pond on the Island of Oahu, Hawaii, are navigable waters of the United States, and that under § 10 of the Rivers and Harbors Act, 33 U.S.C. § 403 (1970),[1] the owner and the lessee of underlying and surrounding lands must obtain authorization from the Army Corps of Engineers for any future construction, excavation or filling affecting the pond. The owner and the lessee of the underlying and surrounding land have taken an appeal from that judgment. The United States also sought to establish that public access must be accorded to the pond as navigable water of the United States. An injunction was sought to prevent the owner and lessee from denying public access and to require them to notify the public of the fact of the pond's accessibility. The district court ruled against the United States on this claim and the government has appealed from that judgment. The decision of the district court appears at 408 F.Supp. 42 (D.Haw. 1976), and contains an excellent discussion of Hawaiian history as it bears on the nature of water bodies such as Kaupa Pond.

The pond is contiguous to Maunalua Bay, which is without question navigable water of the United States. Until 1961, the pond was a fishpond and its waters were used exclusively for the taking of fish. It covers 523 acres and extends inland from Maunalua Bay a distance of approximately two miles. The nature of such ponds was recently discussed by the Hawaii Supreme Court in *In re Keohokalani Kamakana,* Haw., 574 P.2d 1346 (1978). In footnote 2 the court states:

"Fishponds, both along the shore and inland, were part of a complex aquaculture system developed in pre-historic Hawaii. Although fishponds existed elsewhere in Polynesia, in Hawaii they were widespread and included numerous man-made and natural enclosures of water in which fish and other products were raised and harvested. Hawaiian aquaculture's distinctive feature was the sluice grate with its associated sluice. This grate was stationary, with no moveable parts, and allowed the Hawaiians, to progress from tide-dependent fishtraps to artificial fishponds which could be controlled at all times of the tide. *See generally,* R. Apple and W. Kikuchi, *Ancient Hawaiian Shore Fishponds: An Evaluation of Survivors for Historical Preservation* (1975); M. Kelly, *Loko I'a O He'eia* (Bishop Museum, 1975).

Kanoa fishpond is classified as a *loko kuapā,* a fishpond of littoral water whose side or sides facing the sea consist of a stone or coral wall usually containing one or more sluice grates."

Kuapa Pond's private ownership dates from the Great Mahele or royal land division of 1848. By that division large land units, known as "ahupuaa," extending from the volcanic mountains of the interior (which are characteristic of each island) outwardly to the sea were granted by King Kamehameha III to his chiefs. Kuapa Pond was part of an ahupuaa that eventually vested in Bernice Pauahi Bishop and on her death formed a part of the trust corpus of the Bishop Estate, the present owner. As was the case with Kanoa Fishpond in *In re Kamakana,* Kuapa Pond, from time immemorial, was separated from the bay by a sandbar and coral wall, with sluice grates permitting the pond to enjoy the enriching effects of tidal action but with no navigable access to Maunalua Bay. During the early 1900's a roadway was built along the sandbar and reinforced with coral, and bridges were built over the sluice grates.

In 1961, the Bishop Estate leased a 6,000-acre area to Kaiser Aetna for subdivision purposes, and the subdivision known as "Hawaii-Kai" resulted. Kuapa Pond was

---

1. Section 403 in general makes it unlawful, in absence of approval of the Army Corps of Engineers, to create an obstruction to the navigational capacity of any of the waters of the United States, build structures in such waters or excavate or fill so as to alter or modify the course or capacity of such waters.

included in the lease. Under the agreement Kaiser Aetna dredged and filled parts of the pond. Accommodations for pleasure boats were created. The sluice grates were eliminated and the bridges were elevated to allow clearance of 13½ feet over mean water level. Below the bridges a channel was dredged to a depth of 8 feet. The average depth of the pond itself was increased from the fishpond depth of 2 feet to a depth of 6 feet. The pond, so improved, is now known as "Hawaii-Kai Marina." There were, at the time of trial, approximately 1500 marina waterfront lot lessees, all of whom for a fee could procure marina privileges, including pleasure boat use of the pond and access to and from the bay. In addition, some 56 nonresident boat owners for a fee were permitted to moor their boats in the marina and enjoy marina privileges.

Kaiser Aetna controlled access to and use of the marina. Commercial use was not permitted, except for a small vessel, the Marina Queen, which could carry 25 passengers and was used for about 5 years for the purpose of promoting sales of marina lots and for a brief period was used by marina shopping center merchants for promotional purposes.

*Appeal of Kaiser Aetna and Bishop Estate*

Kaiser Aetna and Bishop Estate challenge the district court's holding that Kuapa Pond was navigable water of the United States. There can be little question but that Hawaii-Kai Marina has been rendered navigable by the improvements made by Kaiser Aetna.[2] Over 600 boats enjoy its mooring and fueling facilities, and regularly use the marina as a waterway to Maunalua Bay and the Pacific Ocean. Kaiser Aetna contends, however, that since the waters were privately owned and have never been used in interstate commerce, the marina cannot be held to be navigable water of the United States.

The source of the government's authority over waters was noted in *United States v. Appalachian Electric Power Co.*, 311 U.S. 377, 404–05, 61 S.Ct. 291, 298, 85 L.Ed. 243 (1940), where the Court stated:

"The power of the United States over its waters which are capable of use as interstate highways arises from the commerce clause of the Constitution. 'The Congress shall have Power . . . To regulate Commerce . . . among the several States.' It was held early in our history that the power to regulate commerce necessarily included power over navigation. To make its control effective the Congress may keep the 'navigable waters of the United States' open and free and provide by sanctions against any interference with the country's water assets."

And, later:

"We are dealing here with the sovereign powers of the Union, the Nation's right that its waterways be utilized for the interests of the commerce of the whole country."

*Id.* (footnotes omitted).

The term "navigable water of the United States" was defined in *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1870), where the Court held:

"Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with

2. We accept, arguendo, the contention of Kaiser Aetna that Kuapa Pond in its natural state was not navigable; that although it was subject to the ebb and flow of the tide, that test determines the outer limits of an admittedly navigable water body and does not serve to render navigable a separate and distinct water body not otherwise navigable.

other States or foreign countries in the customary modes in which such commerce is conducted by water."

■ Elaborating on this definition, the Court in *United States v. Appalachian Power Co., supra,* held that "it is proper to consider the feasibility of interstate use after reasonable improvements which might be made" in determining whether a water is navigable, 311 U.S. at 409, 61 S.Ct. at 300. Thus, the factual inquiry is whether the water "has 'capability of use by the public for the purposes of transportation and commerce'." 311 U.S. at 410, 61 S.Ct. at 300. The feasibility of use in interstate commerce can be demonstrated by the existing use of the waterway by private boats for personal use, as the Court stated:

> "Nor is lack of commercial traffic a bar to a conclusion of navigability where personal or private use by boats demonstrates the availability of the stream for the simpler types of commercial navigation."

311 U.S. at 416, 61 S.Ct. at 303.

To the same effect is *Weiszmann v. Dist. Eng., U. S. Army Corps of Eng.,* 526 F.2d 1302, 1305 (5th Cir. 1976), where the court held:

> "There is no requirement that a body of water sustain actual commerce in order to meet the test of navigability. Rather, the mere capability of commercial use of a body of water suffices, even if such commerce could be made possible with artificial aids." (citations omitted).

Kaiser Aetna contends, however, that despite the marina being navigable in fact and demonstrably suitable for commercial use, regulations of the Army Corps of Engineers preclude its being held to be navigable water of the United States. 33 C.F.R. § 209.260(g) reads as follows:

> "(g) *Improved or natural condition of the water body.* Determinations are not limited to the natural or original condition of the water body. Navigability

may also be found where artificial aids have been or may be used to make the water body suitable for use in navigation.

> (1) *Existing improvements: Artificial water bodies.* (i) An artificial channel may often constitute a navigable water of the United States, even though it has been privately developed and maintained, or passes through private property. The test is generally as developed above; that is, whether the water body is capable of use for purposes of interstate commerce. Canals which connect two navigable waters of the United States and which are used for commerce clearly fall within the test, and themselves become navigable. A canal open to navigable waters of the United States on only one end is itself navigable where it in fact supports interstate commerce * * *."

Kaiser Aetna reasons from this language that since Kuapa Pond was not navigable in its natural state but was artificially rendered navigable, and since it is open to navigable waters of the United States at one end only and does not, in fact, support commerce, under the regulation it does not constitute navigable water of the United States.

The government responds: "The short answer is that this portion of the regulations has absolutely no bearing here because Kuapa Pond is not an 'artificial water body.' It is artificially *improved* but not artificially *created.*"[3] We do not find this construction unreasonable and have been cited to no authority construing the regulations otherwise.[4] On its face, if its purpose is to limit jurisdiction of the Corps, the regulation is not clear. It states at one point: "The test is generally as stated above, that is whether the water body is capable of use for purposes of interstate commerce." This would appear to cover the marina. The portions of the regulation on which Kaiser Aetna relies deal with canals and apply here only by analogy. To apply those portions here would be to hold

---

**3.** Brief of the United States as cross-appellee, pages 14–15.

**4.** The government claims support from *United States v. Sexton Cove Estates Inc.,* 526 F.2d 1293, 1299 n.14 (5th Cir. 1976).

that the government voluntarily has surrendered jurisdiction of the Corps with respect to improved natural water bodies in all cases save those where the water body in fact supports interstate commerce, and this despite the government's protest against such construction of its regulation and despite the generous provisions of the Rivers and Harbors Act as construed by the Supreme Court. Under the circumstances we shall not hold the Corps to such a construction of its regulations.

■ For the reasons set forth by the district court in its opinion, *supra*, 408 F.Supp. at 54–55, we agree that the Corps' acquiescence in Kaiser Aetna's improvements cannot result in the government being held estopped to contend that the marina is navigable water of the United States.

■ We conclude that under *The Daniel Ball, supra*, and *Appalachian Power Co., supra*, the Hawaii-Kai Marina was navigable water of the United States and within the regulatory control of the United States under the Rivers and Harbors Act.

### Appeal of the United States

It has been emphasized by Kaiser Aetna throughout these proceedings that under Hawaii property law the fishpond as a fishpond—the submerged land together with the waters of the pond—constitutes a unit of property unlike any known to the continental United States; that it has the property characteristics of fast land and is not subject to a navigational servitude.

The district court agreed. While holding that Kuapa Pond was navigable water of the United States, it ruled that the pond "was never servient to any 'navigation servitude;' it was always the legal equivalent of fast land for property and 'navigation' purposes. Therefore, its owners had the right to exclude the public therefrom * *." 408 F.Supp. at 52.

The court concluded:

"[W]hile Congress may provide for the improvement and regulation of navigation, and take necessary action to prevent interference or obstruction to navigation,

it cannot impose a *public* navigation servitude upon such a privately constructed waterway without paying a reasonable compensation for the use thereof." 408 F.Supp. at 54.

In this we hold that the court was in error.

■ We note first that Kuapa Pond lost its fishpond characteristics and ceased to exist as a fishpond when it was transformed into a marina. Even fast land appurtenant to a waterway can by excavation be submerged and rendered a part of the waterway and should this occur the land loses its character as fast land and takes on the character of submerged land. *Weiszmann v. Dist. Eng. U. S. Army Corps of Eng., supra*, 526 F.2d 1302, 1305 (5th Cir. 1976); *United States v. Stoeco Homes, Inc.,* 498 F.2d 597, 611 (3d Cir. 1974), *cert. denied,* 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975). Thus, even if the pond as such is considered to be the "legal equivalent of fast land" under state law, when it was converted into a marina and was made navigable in fact it took on the character of a waterway.

Further, we disagree with the manner in which the district court has resolved the problems presented by the conflict between federal and local law respecting property rights and servitudes.

■ In the first place, in our judgment, federal regulatory authority over navigable waters (which the district court recognized to exist) and the right of public use cannot consistently be separated. It is the public right of navigational use that renders regulatory control necessary in the public interest.

■ Secondly, the federal navigational servitude and the public right of use are not imposed or appropriated by action of the government in the nature of seizure. They exist as characteristics of all navigable waters of the United States. *United States v. Rands,* 389 U.S. 121, 122–23, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967); *United States v. Chicago, M., St. P. & P. R.R.,* 312 U.S. 592,

595–97, 61 S.Ct. 772, 85 L.Ed. 1064 (1941). Land underlying navigable water differs from fast land in its servient characteristics which result from the dominant property characteristics of the navigable water by which it is submerged. If fast land is to be subjected to public use for transportation, it must voluntarily be dedicated to the public by the owner, or must be acquired by the public with due compensation to the owner. But land underlying navigable water underlies an existing public roadway. By virtue of the water's presence it is burdened with a public servitude. If the water body is interstate or forms part of an interstate waterway the navigational servitude runs to the federal government.

Hawaii property law at most relates to any servitude the state may claim. If the state chooses to relieve land underlying fishponds such as Kuapa Pond from any navigational servitude otherwise owing to the state (even after the pond's transformation into a marina), that is the state's business. The effect of Hawaii law on state rights, however, is not before us. No matter what those rights may be they can have no effect on the federal interest in interstate commerce nor the rights and obligations of the federal government in this respect under the Constitution. When the waters of the pond became navigable waters of the United States, the federal navigational servitude attached.

On the appeal of Kaiser Aetna and the Bishop Estate, judgment of the district court is affirmed. On the appeal of the United States, judgment is reversed and the matter is remanded for entry of judgment in favor of the United States.