John H. BOONE, Esq., Trustee of the Maud Van Cortland Hill Schroll Trust, Plaintiff,

v.

UNITED STATES of America; Department of the Army; United States Corps of Engineers; John O. Marsh, Jr., Secretary of the Army; Lieutenant General Henry J. Hatch, Chief of Engineers, Corps of Engineers, U.S. Army; Brigadier General Arthur E. Williams, Division Engineer, Pacific Ocean Division, Corps of Engineers, U.S. Army; Colonel F.W. Wanner, District Engineer, Honolulu District Corps of Engineers, U.S. Army, Defendants.

Civ. No. 88–00462 DAE.

United States District Court, D. Hawaii.

Nov. 22, 1989.

**1510**

Diane D. Hastert, Damon Key Bocken Leong & Kupchak, Honolulu, Hawaii, for plaintiff.

Stephen Samuels, Environmental Defense Section, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND DECISION

DAVID A. EZRA, District Judge.

Plaintiff and counterclaim-defendant, John H. Boone, Esq. ("Trustee"), as trustee[1] of the Maud Van Cortland Hill Schroll Trust ("the Trust") brought this action for declaratory judgment against the United States, the Secretary of the Army, and several individuals in their official capacities as officers of the United States Army Corps of Engineers ("Corps") to secure the Trust's right to deny access to Pukoo Lagoon, a man-made, clover-leaf shaped lagoon located on the Island of Molokaí, Hawaii.

The Trust's predecessor in interest, Canadian–Hawaiian Developers ("Canadian–Hawaiian"), after obtaining local, state and federal government authorization, constructed the lagoon in its present form in 1971–73 by dredging and filling the former Pukoó Fishpond. The Trustee specifically seeks a declaration that Pukoo Lagoon was private property at the time of its construction, and remains so today, and that it is not subject to a navigational servitude requiring general public access.

The Trust currently owns in fee simple the property upon which Pukoo Lagoon is situated as well as several acres surrounding the lagoon, and wishes to keep the property as clean and tranquil as possible by limiting access to the area to a limited number of organizations who share the Trust's expressed goal of promoting native Hawaiian culture.

Defendant and counterclaim-plaintiff United States ("the government") seeks a declaration that Pukoo Lagoon is subject to a federal navigational servitude requiring general public access. The government asserts, and asks the court to declare, that when Canadian–Hawaiian applied to the Corps in 1970 for a permit to perform certain dredging activities associated with the development of Pukoo Lagoon, the Pukoó Fishpond constituted "navigational waters" within the meaning of the Rivers and Harbors Appropriation Act of 1899 § 10, 33 U.S.C. § 403 (1982); that the permit the Corps issued to Canadian–Hawaiian in 1971 authorized dredging and filling activities within as well as outside the fishpond; and that a condition of the 1971 permit, condition (k), requires that the Trust allow the general public free and full use of all navigable waters at or adjacent to the area to which the permit applied, which includes the waters of the former Pukoó Fishpond, now Pukoo Lagoon.

The government further contends, and asks the court to declare, that even without the requirement imposed by condition (k) in the permit, the waters of the Pukoo Lagoon are subject to a federal navigational

---

1. On October 23, 1989, the court granted plaintiff's motion to substitute John H. Boone, Esq. for First Trust National Association as Trustee plaintiff.

servitude, because the waters of the Pukoó Fishpond were navigable waters at the time Canadian–Hawaiian applied for permission to perform the dredging and filling, and remained so after the construction.

Plaintiff Trustee asserts that Pukoó Fishpond was private property under traditional Hawaiian law, and that in 1971 it was not "navigable waters" within the meaning of the Rivers and Harbors Appropriation Act of 1899 § 10, 33 U.S.C. § 403 (1982). Plaintiff Trustee also asserts that the permit issued in 1971 authorized only dredging outside of the Pukoó Fishpond; that the filling and dredging inside the fishpond did not require authorization by the Corps because the fishpond was not "navigable waters"; and that condition (k) in the permit only required public access to those navigable waters covered by the dredging permit—areas outside the area that had been Pukoó Fishpond.

In addition, the government raises the defense that the failure of the Trust and its predecessor in interest to challenge the 1971 permit within the six-year statute of limitations, 28 U.S.C. § 2401(a) (1982), precludes the bringing of this action. The government also asserts that the court lacks subject matter jurisdiction to render declaratory or other relief relating to any alleged taking in the context of this case.

The court, having heard this action at trial without a jury and having carefully considered the stipulations of the parties and evidence in the form of submissions of exhibits and the testimony of witnesses, now renders its findings of fact, conclusions of law and decision in this case.

## FINDINGS OF FACT

### I. The pre-development fishpond

Pukoó Fishpond was a Hawaiian fishpond [2] located on the southeastern shore of the Island of Molokai. The fishpond covered approximately 25 acres, and its wall which separated the fishpond from the ocean was contiguous to Pukoo Harbor, a navigable, natural depression in the offshore reef in the Pacific Ocean. The wall was approximately 2000 feet long, 10 feet wide and 5 feet high. Contained within the wall were two *mahaka* [3], one located near the center of the wall, and the other located in the south-west portion of the wall. One purpose of the *mahaka* was to permit water to circulate within the fishpond to keep the fishpond from stagnating, and to bring nutrients to the fish kept in the pond. Another purpose was to capture fish that were small enough to enter the pond through grates in the *mahaka*, but after feeding within the pond were too large to escape back through the *mahaka* into the open ocean.

According to records received into evidence, Pukoó Fishpond was constructed in or about 1829. In 1852, the Hawaiian Land Commission vested title to the pond in Ilae Napohaka, and the fishpond has remained in private hands ever since. In 1946, a tsunami (tidal wave) hit and damaged the wall, but the weight of the testimony before the court leads it to find that in 1971 the wall was not so damaged as to fail to perform its function of keeping the normal wave action of the ocean from disturbing the still waters of the fishpond. As of 1971, Pukoó Fishpond had a depth ranging

---

**2.** A "Hawaiian fishpond", or *loko iá,* is a pond that native Hawaiians constructed to fatten and store fish for food, and to use as a source for certain types of fish that were otherwise under a *kapu,* or taboo during the fish's spawning season. The fishponds were an integral part of the Hawaiian feudal system prior to King Kamehameha II's proclamation of the Great Mahele, or national land distribution. The Hawaiians distinguished the fishponds by the manner in which they were constructed and by their location relative to the sea. The fishpond in the instant case and the fishpond in *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979) both were *loko kuapa,* littoral water fishponds that the Hawaiians created

by constructing stone walls across all sides facing and having access to the sea, or in the case of naturally created fishponds, by reinforcing natural sandbars with stone walls. For a further discussion of the history of Hawaiian fishponds and their role in feudal Hawaii, see *United States v. Kaiser Aetna,* 408 F.Supp. 42 (D.Haw.1976), *aff'd in part, rev'd in part,* 584 F.2d 378 (9th Cir.1978), *rev'd,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979).

**3.** Hawaiian fishponds generally contained one or more *mahaka,* or openings to the sea, in which sluice grates were placed, allowing fry to enter and exit the fishpond to feed.

from one to three feet and was subject to the ebb and flow of the tide.[4]

The owners of Hawaiian fishponds, as well as the Hawaiian government, from the time of the national land distribution by the Kingdom of Hawaii (sometimes referred to as the Great Mahele or Mahele) through the Annexation of Hawaii by the United States in 1898 and until today, have considered fishponds to be private property. *See Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979) (recognizing that fishponds are private property under Hawaiian law and that the title holders of fishponds have rights that are equivalent to those of owners of fast lands adjacent to navigable waters); *In re Kamakana*, 58 Haw. 632, 574 P.2d 1346 (1978) (confirming that a fishpond which had substantially deteriorated still remained private property under Hawaiian law, absent a showing of adverse possession by the government).

The navigability of Pukoó Fishpond prior to the issuance of the 1971 permit is in dispute and represents a significant dispositive issue in this case. The government has presented the testimony of several residents of Molokaí who claim to have navigated from Pukoo Harbor into Pukoó Fishpond, as admitted trespassers, in flat bottom boats over the fishpond wall to take fish from what they knew to be private property. The court notes that these individuals claim to have surreptitiously entered the fishpond by methods designed to avoid detection by the authorities or others. Their testimony varied as to their alleged points of entry into the fishpond as well as to the specific means they claim to have used to navigate the fishpond, with at least one of the witnesses testifying that he had to use a pole to keep the boat from hitting the bottom of the fishpond once his boat had cleared the wall. Indeed, the only consistent testimony among these witnesses was that a clear line of demarcation existed between the Pacific Ocean and the Pukoó Fishpond.

The government also offered evidence in the form of expert testimony by a photogrammetric *technician* who, having analyzed a series of aerial photographs, opined that in 1961 large sections of the fishpond wall were either in disrepair or non-existent and covered by over 1.9 feet of water. The Trust, however, submitted the expert testimony of a photogrammetric *engineer* who testified that with the limited aerial photographs available, a qualified photogrammetric engineer could not determine with any certainty whether any portion of the fishpond wall was submerged. Moreover, the Trust's expert testified within a ninety percent assurance level of accuracy that defendant's expert's vertical precision calculations may be off by as much as 2.6 feet. In light of all other relevant evidence, the court finds the testimony of the Trust's expert witness to be more credible than that of defendants' expert witness.

To support its contention that the fishpond wall was intact, contiguous, above water and would not likely admit even the shallowest of boats into the fishpond, the Trust has submitted significant and compelling evidence. This evidence includes a number of ground-level photographs of the fishpond which confirm that the fishpond wall was intact, as well as the testimony of various witnesses who were familiar with the pond.

The court finds particularly persuasive the testimony of a disinterested, life-long Pukoo, Molokaí resident, Laura Duvauchelle Smith, who was intimately familiar with the fishpond and its surrounding environs from her childhood. Mrs. Smith corroborated the evidence found in the ground photographs through her testimony based upon her frequent observations that spanned a number of decades that the wall was never below the surface of the water, even at high tide.

The court also found persuasive the testimony of oceanographer/marine biologist Richard Grigg, Ph.D, who, while surveying the site on behalf of the State of Hawaii

---

**4.** During normal tides, there was up to a two-foot difference in the depth of Pukoó Fishpond at low and high tide.

Department of Health (HDOH), swam along the entire length of the wall in 1971 immediately prior to the development of the lagoon. Dr. Grigg testified that he did not observe any breaks in the wall, and that he saw no parts of the wall that were submerged. Based upon his observations, he concluded that it did not seem possible that one could navigate over the pond wall in a boat.

The court also considers probative the testimony of Alexander Brodie, a Captain in the United States Coast Guard Reserve who was familiar with the fishpond through his work with a dredging company which provided the joint venture with an informal bid on the cost of dredging for the Pukoo project. Captain Brodie testified that he walked the full length of the wall in late 1970 and that the only gaps he could see at that time were at the *mahaka.*

The Trust's evidence is consistent with, and directly supports its position that the fishpond wall presented a substantial barrier to navigation from the open sea. The Trust's predecessor in interest and a promoter of the Pukoo Lagoon project, Harold Wright, and his son, Barry Wright, also directly contradict defendant's assertion that portions of the fishpond wall were completely submerged during the periods suggested by defendant's witnesses.

This court, in weighing the evidence submitted by both parties on the disputed issue of the navigability of the pond, finds the Trust's evidence to be more persuasive than that submitted by the government. The Trust presented testimony of credible disinterested observers of the fishpond that was consistent with the evidence contained in the numerous ground-level photographs of the wall as well as with the testimony of the Trust's expert photogrammetric engineer. The court finds that the Trust has established by a preponderance of the evidence that prior to 1971, although portions of the fishpond wall were in some disrepair, the wall as a whole was substantially intact throughout and could not be readily traversed by a boat in the most favorable sea conditions. Consequently, the court finds the fishpond wall in its ordinary state constituted a barrier to navigation. Moreover, the court finds Pukoó Fishpond was

functional as a private fishpond but was not feasible for commercial purposes.

## II. *The permit process and the development of Pukoo Lagoon*

Pukoo Properties, Inc. ("Pukoo Properties"), a Hawaii corporation, purchased Pukoó fishpond and the surrounding property in or about 1960 for between $50,-000.00 and $75,000.00. In a joint venture with Keoni Apeka Holdings, Inc. (also a Hawaii corporation) under the name of Canadian–Hawaiian Developers, Pukoo Properties developed plans to create more than 900 resort units on the property. To secure the necessary permits and approvals from federal, state, and local government agencies required for the planned development, Canadian–Hawaiian engaged the services of Hawaii attorney Francis Izumi.

On December 23, 1969, Canadian–Hawaiian filed a petition with the Land Use Commission to change the property's state land use designation from rural/conservation to urban. The Commission approved the petition on June 12, 1970. On June 30, 1970, Canadian–Hawaiian requested that the County of Maui change the zoning of the property from County Interim Zone to H–M Hotel District. The County of Maui authorized the change, effective October 19, 1970.

By the beginning of the last quarter of 1970, Canadian–Hawaiian had completed plans for the creation of what is now known as Pukoo Lagoon. In addition to its plans to develop Pukoo Lagoon as a resort area, Canadian–Hawaiian sought to create, by dredging the waters contiguous to Pukoó Fishpond, an approach channel, a boat anchorage basin and public beaches on submerged public lands owned by the State of Hawaii. Canadian–Hawaiian, through its attorney, prepared applications to the Corps of Engineers and various state agencies for permission to develop the submerged lands through dredging and filling.

Canadian–Hawaiian's attorney began the permitting process with an application to the Hawaii Department of Land and Natural Resources ("HDLNR") for: (1) a general lease for use of an offshore boat basin

on and above the submerged public lands in the Conservation District; (2) a permit for boat basin use within the offshore submerged public lands in the Conservation District; and (3) a right-of-entry permit to construct three segments of public beaches within an area of submerged public lands in the Conservation District adjacent to the ocean boundary of Pukoó Fishpond.[5] Shortly thereafter, Canadian–Hawaiian submitted to the State Department of Transportation ("DOT"), Harbors Division, an Application for Permit for Work in the Shore Waters of the State of Hawaii for the "excavation of submerged public land."[6] The stated purpose of the proposed work was to create public beaches, a boat anchorage basin and approach channels; the location of the proposed work was to be on submerged public land adjoining Pukoo Harbor, Island of Molokaí. Canadian–Hawaiian estimated that approximately 214,000 cubic yards were to be spoiled upon applicant's TMK [Tax Map Key] 5–7–07, Parcel 21[7], and also to be used for construction of proposed public beach upon adjoining state-owned submerged land.

Canadian–Hawaiian also applied to the Corps for a permit "to conduct dredging operations in the construction of public beaches, a boat anchorage basin and approach channels at Pukoo, Island of Molokaí, upon an area of offshore waters and underlying submerged public land adjoining, and to be connected to, Pukoo Harbor and the open sea...." (hereinafter November 5 permit application).[8] In response to the permit application, the Corps sent Canadian–Hawaiian's counsel, Francis Izumi, a manual entitled "Permits for Work in Navigable Waters." The Corps sent a copy of the same document to Canadian–Hawaiian's engineer, Henry Hoshide[9] of Wilson, Okamoto & Associates.

The manual provides that "(m)aps and plans showing the location, extent, and character of the proposed work are an essential part of an application for a permit. Such drawings are attached to and form a part of the permit, and must be carefully prepared in the form prescribed." Corps of Engineers, Dept. of the Army, Permits for Work in Navigable Waters 8 (1968). The manual further provides that "(t)he drawings will be on sheets 8 by 10½ inches in size, measured from edge to edge with a margin of 1 inch along the top 8–inch side for binding purposes. As few sheets will be used as necessary to show clearly what is proposed." Id. at 9. "The map will show the area to be dredged, and, unless the material is to be placed on an established dumping ground, the exact locality for the disposal of the excavated material. Both of these areas will be drawn in *red ink* on all copies and suitably designated by words." Id. at 10 (emphasis added). Shortly after receipt of the manual, Mr. Hoshide transmitted to the Corps a supporting sketch of the proposed project, of which the Corps subsequently acknowledged receipt.

In addition to the permit applications noted above, Canadian–Hawaiian applied to the Hawaii State Department of Health ("HDOH") for reclassification of shore waters pursuant to public health regulations and requested HDOH approval of its application to the Department of Transportation, Harbors Division, for a shore water work permit. In the meantime, the Corps had completed its initial review of Canadi-

---

**5.** Letter from Canadian–Hawaiian Developers, by Harold S. Wright, President, Pukoo Properties, Inc. to Sunao Kido, Chairman, Board of Land and Natural Resources, State of Hawaii (Oct. 22, 1970).

**6.** Application by Canadian–Hawaiian Developers to Harbors Div., Dept. of Transp., for Permit for Work in the Shore Waters of the State of Hawaii (Nov. 5, 1970).

**7.** TMK 5–7–07, Parcel 21 represents what was Pukoó Fishpond and is now plaintiff's fee property, Pukoo Lagoon.

**8.** Letter from Canadian–Hawaiian Developers, by Harold S. Wright, President, Pukoo Properties, to the District Engineer, U.S. Army Corps of Engineers (Nov. 5, 1970).

**9.** Both of the individuals who were the most familiar with the engineering drawings involved in this project, Mr. Hoshide, and his counterpart with the Corps of Engineers, Mr. Joseph C. Waters, were deceased at the time of trial.

an–Hawaiian's November 5 permit application and indicated that the application for the dredging permit did not include a certification by HDOH that the discharge and deposits described in the application would not violate applicable water quality standards. The Corps properly required this certification under section 21 of the then existing version of the Water Quality Improvement Act of 1970, Pub.L. No. 91–224, 84 Stat. 91, 107 (superseded by Pub.L. 92–500, § 2, 86 Stat. 816 (1972)). Canadian–Hawaiian subsequently initiated a request for required HDOH certification and so advised the Corps.

The Corps, in continuing its review of Canadian–Hawaiian's permit application, indicated that the permit process would be expedited if Canadian–Hawaiian furnished letters of concurrence or permits from the County of Maui's planning and construction agencies. In response to the Corps's request, Canadian–Hawaiian's attorney sent a letter to the Department of County Works, County of Maui, enclosing a number of documents, including a "[c]opy of reduced scale sketch plan entitled *Proposed Dredging at Pukoo, Molokai, Hawaii,* prepared at request of Corps of Engineers." [10] Canadian–Hawaiian sent a similar letter with the same enclosures to the Department of Planning, County of Hawaii. At the same time, Canadian–Hawaiian requested that each department concur with its application to the Corps for a permit to dredge in the waters adjoining the Pukoó Fishpond.

Within the next two months both the Maui County Planning Director and the Director of Public Works forwarded their recommendation for approval of the plans and specifications as submitted for backfilling of the fishpond to the Army Corps of Engineers.

The court finds from the evidence brought forth at trial that both directors clearly believed that the permit only covered dredging in an area outside of the fishpond, and that it did not cover the filling within the fishpond. The court further finds from the evidence received at trial that neither the County of Maui nor the State of Hawaii required that Canadian–Hawaiian seek permission to dredge inside Pukoó Fishpond, its own fee property, and Canadian–Hawaiian did not, in fact, seek such permission. Canadian–Hawaiian did, however, seek from the County of Maui Department of Public Works a permit covering the filling and grading of a portion of Pukoó Fishpond, and the county granted that permit.

On January 19, 1971, Wilson, Okamoto & Associates transmitted a revised supporting sketch to the Corps. The major change in the project reflected in the revised sketch was the relocation of the boat basin northward so that the boat basin would be out of the "wave zone". Canadian–Hawaiian withdrew the original dredging and construction plans that it had submitted with the November 5th permit application and submitted revised plans to the Corps on January 21, 1971, consistent with the revised sketch, "with the only change [from the November 5th permit application] being revised Sheet No. C–1, which shows the slight relocation and reduction in area of the boat basin ..." [11] Canadian–Hawaiian also submitted a revised survey map and legal description of the boat basin and advised the Corps that HDLNR would be holding a public hearing on Canadian–Hawaiian's application for boat basin use within one of the state's conservation districts.

At the same time, Canadian–Hawaiian forwarded the revised plans, sketch, map and legal description to HDOT, Harbor Division, and requested that the division substitute the revisions for the items that Canadian–Hawaiian submitted in its November 5th application for a shore water work permit. Shortly thereafter, HDOT Harbors Division issued Shore Waters Construction Permit 1475 to Canadian–Hawaiian for the "[e]xcavation of submerged public land to create public beaches, a boat anchorage basin and approach channels,

**10.** Letter from Francis M. Izumi to Mr. John M. Fernandez, Maui County Director of Public Works (Dec. 4, 1970).

**11.** Letter from Canadian–Hawaiian by Francis M. Izumi to Roy A. Sanders, Col., Army Corps of Engineers (Jan. 21, 1971).

**1516**

Pukoo, Molokaí, County of Maui." Permit No. 1475 for Work in the Shore Waters of the State of Hawaii (Mar. 30, 1971). Upon the recommendation of Dr. Richard W. Grigg of the University of Hawaii Institute of Marine Biology who inspected the construction area in developing an environmental impact statement on behalf of HDOH, Permit No. 1475 was later amended to include the condition that Canadian–Hawaiian dike the entire fill area and leave intact the fishpond wall until the completion of fill operations to prevent large scale silting into the sea, and noted that all fill operations would then take place behind the fishpond wall.

On May 7, 1971, the Corps issued a public notice of Canadian–Hawaiian's permit application. A map, entitled "Proposed Dredging at Pukoo, Molokaí, Hawaii," appeared on the reverse side of the public notice. The notice indicated that Canadian–Hawaiian had applied for permission to excavate "submerged land to create public beaches, a boat anchorage basin and approach channels...." U.S. Army Corps. of Engineers, Pub. Notice No. PODCO–O 969–D (May 7, 1971). The proposed lagoon is not mentioned in the notice.

Prior to the issuance of the notice, the Chairman of the State of Hawaii Board of Land and Natural Resources recommended to the Board the approval of Canadian–Hawaiian's application for the use of submerged lands for a boat basin. The report accompanying the recommendation specifically noted that the proposed boat basin was to be "part of a resort complex to be developed by the applicant on *adjacent fast lands*"[12] (emphasis added), and that the resort complex would include a man-made clover-leaf shaped lagoon, and an approach channel. After the board acted on the recommendation, the Chairman conveyed to the Corps the support of HDLNR for the project. In the Chairman's letter to the Corps, no mention is made of the proposed lagoon. The Board of Land and Natural resources does, however, mention the lagoon in its findings of fact, decision and order issued on May 19, 1971, after the

Corps had issued its public notice. The May 19, 1971 decision clearly indicated that the project would provide fill material for portions of Pukoó Fishpond.

As a result of Canadian–Hawaiian's efforts, the Corps issued DA Permit No. 969–D on June 30, 1971 authorizing Canadian–Hawaiian "to excavate 214,000 cubic yards of materials in submerged lands to create public beaches, a boat anchorage basin and approach channels in waters of the Pacific Ocean at Pukoo, Molokaí, County of Maui, State of Hawaii in accordance with the plans and drawings attached [to the permit application] entitled 'Proposed Dredging at Pukoo, Molokaí, Hawaii....' " Dept. of the Army Permit No. 969–D (June 30, 1971). The permit also contained the following conditions:

(a) That [the permit] does not convey any property rights either in real estate or material, or any exclusive privileges; and that it does not authorize any injury to private property or invasion of private rights, or any infringement of Federal, State or local law or regulations, nor does it obviate the necessity of obtaining State or local assent required by law for the structure or work authorized.

\* \* \* \* \* \*

(k) That no attempt shall be made by the permittee to forbid the full and free use by the public of all navigable waters at or adjacent to the structure or work authorized by this permit.

\* \* \* \* \* \*

(q) That all the provisions of this permit shall be binding on any assignee or successor in interest of the permittee.

(r) That if the recording of this permit is possible under applicable State or local law, the permittee shall take such action as may be necessary to record this permit with the Registrar of Deeds or other appropriate official charged with the responsibility for maintaining records of title to and interest in real property.

\* \* \* \* \* \*

12. Report from Gordon Soh, Program Planning Coordinator, Hawaii Department of Land and Natural Resources, to Board of Land and Natural Resources (April 23, 1971) (with Board Chairman's signature noting approval).

(u) That the fish pond wall will be rebuilt prior to dredging to prevent large scale silting of the reef area by filling behind this wall.

*Id.*

The court notes the Corps does not dispute that it did not retain the original of any document which Canadian–Hawaiian or its representatives submitted as part of the permitting process. The Corps acknowledges that it transferred all such documents to microfiche, and as a direct result, the Corps's files contain no color originals of any map submitted by Canadian–Hawaiian or its representatives in connection with the application or permit despite the fact that the Corps required Canadian–Hawaiian to delineate, by red ink hatching, certain critical portions of drawings submitted as part of its applications.

The court also notes that Canadian–Hawaiian did not record the permit pursuant to condition (r) of the permit. The court finds by a preponderance of the evidence that Canadian–Hawaiian did not record the permit because it did not believe that the Corps issued permit included the work to be performed on its fishpond property. Canadian–Hawaiian reasoned that the permit did not affect its fee simple ownership rights in the lagoon development property, and therefore recordation was not necessary under state law, nor required under condition (r).

On August 10, 1971, Canadian–Hawaiian filed its final permit application with the County of Maui for permission to grade and fill the Pukoó Fishpond with materials dredged from the boat anchorage basin and boat approach channel. In the application, Canadian–Hawaiian estimated that it would place 190,000 cubic yards of dredged material and 28,300 cubic yards of sand to create a lagoon and public sand beaches along the makai (seaward) boundaries of the fishpond wall.

After receiving the County permit, Canadian–Hawaiian dredged an approach channel and boat basin, created public sand beaches along the makai boundaries of the fishpond wall and converted Pukoó Fishpond into a clover-leaf shaped lagoon at a cost of approximately $1.6 million. Some-

time after Canadian–Hawaiian completed construction of Pukoo Lagoon, the joint venture abandoned development plans for a resort. The parties agree, and this court finds, that after the completion of the project, Pukoo Lagoon was navigable in fact and remains so today.

A critical issue of fact in this case is whether the Corps permit authorized dredging work inside Pukoó Fishpond. The Trust maintains that the permit did not govern dredging within Pukoó Fishpond; the government asserts that it did.

The Trust has provided the court with substantial and convincing evidence in support of its position. The court notes that Canadian–Hawaiian's letter of engagement to attorney Francis Izumi limited the scope of his services to obtaining a permit from the Corps authorizing the dredging operations in the area of ocean waters and underlying submerged public land adjoining Pukoó Fishpond. Consistent with this evidence, Mr. Izumi testified that he never sought authorization from the Corps regarding proposed dredging operations within Pukoó Fishpond. Finally, both Francis Izumi and Harold Wright, President of Pukoo Properties, Inc., testified that they never sought authorization from the Corps to dredge Pukoó Fishpond.

The intent of Canadian–Hawaiian is further reflected in the plain language of the permit application and the permit itself. On its face, the November 5th permit application sought authorization:

to conduct dredging operations in the construction of *public beaches,* a *boat anchorage basin* and *approach channels* at Pukoo, Island of Molokaí, *upon an area of offshore waters and underlying submerged public land* adjoining, and to be connected to Pukoo Harbor and the open sea.... The extension of the channel adjoins *Pūkoó Fish Pond* ... which is *owned by the applicant.*

The area upon which *dredging* will be conducted is *owned by the State of Hawaii....*

Approximately *214,000 cubic yards of material will be dredged and,* except for such amount as shall be used to create

... the three segments of public beaches as shown on Wilson, Okamoto & Associates' plan, all material will be *spoiled only upon applicant's fee property.* (Emphasis added).

Moreover, the legal description of the submerged land comprising the area to be dredged specifically set forth as its boundaries Pukoó Fishpond wall. Similarly, the microfiche copies in evidence of the maps attached to the application to the Corps, as well as the maps attached to various permit applications to local and state agencies, indicate a clear line of demarcation between Pukoó Fishpond and the adjacent area of state-owned submerged land referred to as being the subject of the permit. Finally, the grading plan map indicates in the "summary of quantities" section that the 214,000 cubic yards of dredged materials were to come from the adjacent state owned submerged lands.

As indicated above, the plain language of the permit demonstrates the intent of both parties to limit the Corps's authorization for dredging to the adjacent state owned submerged lands. The permit specifically speaks of "excavat[ing] 214,000 cubic yards of materials in submerged lands to create public beaches, a boat anchorage basin and approach channels in waters of the Pacific Ocean at Pukoo, Molokaí, County of Maui, State of Hawaii in accordance with the plans and drawings attached [to the application] entitled "Proposed Dredging at Pukoo, Molokaí, Hawaii...." The permit never mentions or refers to the construction of a clover-leaf shaped lagoon.

The court finds little credible evidence to support the Corps's argument that the dredging of the clover-leaf shaped lagoon was within the scope of the language authorizing dredging of one of the approach channels. In this regard, the court finds that had the Corps intended to authorize the dredging and construction of such an

unusual lagoon within Pukoó Fishpond it would have specifically stated so in the permit itself.

The Corps also asserts that it relied on the drawing attached to the permit (the original of which is no longer available) in its authorization of the dredging of the lagoon and that hatching on the drawing clearly indicated that the construction of the clover-leaf shaped lagoon was within the scope of the dredging operations.[13] The court finds that this alleged reliance is inconsistent with the Corps's admission that its practice was to issue permits only for work for which an applicant had applied for permission to undertake, and not for work beyond the scope of the application.

Moreover, the Trust has introduced credible circumstantial evidence and testimony suggesting that the map submitted to the Corps entitled "Proposed Dredging at Puko'o, Molokaí, Hawaii" was colored, in substantial compliance with the Corps's permit application manual, to differentiate between that dredging work for which Canadian–Hawaiian sought the Corps's authorization and that for which it did not. As this court previously noted, as a result of the Corps's record retention policies and procedures, only black and white microfiche copies remain of drawings upon which the Corps required Canadian–Hawaiian to show, in color, the parameters of the project proposal. The court, thus faced with reconstructing the color portions of drawings, must weigh the evidence that the parties present on this issue. The court finds that the Corps's evidence simply does not rebut the Trust's evidence that Canadian–Hawaiian indicated on the original color drawings accompanying the permit application the scope of the dredging activity to be covered by the permit. The court further finds that the evidence of Canadian–Hawaiian's intent combined with the language of the permit application and the attachments to the application demonstrate conclusively

---

**13.** Had the Corps maintained the color originals of the drawings submitted by Canadian–Hawaiian, the court could more easily answer the question of whether the dredging and filing activities within the fishpond were covered by the Corps issued permit, for the red ink markings would have been compelling evidence of parties' understanding of the extent of the Corps's approval. Because the Corps chose not to keep the originals, they are not available, and the court must look to other evidence of the intent of the parties as to the scope of the work covered by the permit.

that Canadian–Hawaiian did not apply for authorization to conduct dredging operations within Pukoó Fishpond.

The court thus finds that based upon all the evidence adduced at trial, Canadian–Hawaiian did not seek authorization from the Corps to conduct dredging and filling operations within Pukoó Fishpond and the permit the Corps issued did not authorize dredging work within Pukoó Fishpond. The court further finds that Canadian–Hawaiian engaged in dredging and filling activities within Pukoó Fishpond at considerable cost with the expectation that the resulting waters of Pukoo Lagoon would remain, in accordance with traditional Hawaiian law, its private property, to which it could legally control access.

### III. *Post-development activity*

The Trust first became aware of the property in the mid– to late–1970's when one of the trustees saw the property by air on a visit to Molokaí. In 1979, representatives of the Trust conducted a site inspection of the Pukoó Property with an eye towards purchasing it. Negotiations with Harold Wright, representative of Canadian–Hawaiian, ensued in late 1979 and culminated on March 19, 1980 with the Trust paying $5.25 million for the Pukoó Property and $500,000 for development rights to the property.[14] The Trust has invested an additional $340,000.00 to $500,000.00 in improvements to the property since its purchase.

The evidence reflects that throughout the negotiations, the Trust's representatives believed that the lagoon and its waters were private property, and the evidence convinces the court that they had no reason to believe otherwise. The court credits the testimony of Christopher Schroll, once a trustee for the Trust and now an agent for the Trust, that the Trust would not have purchased the property had it known that there was a question as to its private nature. The long time posting and maintenance at the lagoon's entrance of "private property" signs also support the

Trust's position that there was no public access right to use of the lagoon.

Moreover, the evidence also supports the finding that the Trust was unaware of the existence of the Corps-issued permit throughout the duration of the sales negotiations with Canadian–Hawaiian but became aware of the permit by virtue of a December 1, 1982 letter written by Col. Alfred Thiede of the Corps to the State of Hawaii Land Use Commission. The court further finds that prior to December 1, 1982, neither the Trust nor its predecessor in interest was aware of the Corps position that condition (k) created a right of general public access to the lagoon's waters.

The Trust's practice was, and continues to be, to permit a local Hawaiian canoe club and certain local Hawaiian groups to use portions of the lagoon property for cultural purposes, and to exclude the general public and all commercial use so as to avoid spoilage of the property.

### CONCLUSIONS OF LAW

#### I. *Introduction*

■ Article 1, § 8 of the Constitution, the Commerce Clause, provides Congress with extensive authority to regulate the Nation's waterways, and that authority does not depend upon the navigability of a particular body of water. *Kaiser Aetna* 444 U.S. at 173–74, 100 S.Ct. at 389–90 (citing *United States v. Appalachian Power Co.,* 311 U.S. 377, 426–27, 61 S.Ct. 291, 308, 85 L.Ed. 243 (1940)). The authority is as broad as necessary to meet the needs of commerce. *United States v. Appalachian Power Co.* 311 U.S. 377, 427, 61 S.Ct. 291, 308. Although it is clear that Congress may, with appropriate legislation, exercise the government's power of eminent domain and assure the public the free right of access to Pukoo Lagoon, it is a separate question whether the Army Corps of Engineers has the authority to do the same.

■ In enacting the Rivers and Harbors Act of 1899, Congress granted broad authority to the Army Corps of Engineers

---

**14.** Canadian–Hawaiian and the Trust subsequently reformed the contract of sale and pur-

chase for the purpose of effecting a legal tax free exchange of property.

to regulate the navigable waterways of the United States to ensure they remain free from obstruction. *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201, 88 S.Ct. 379, 385–86, 19 L.Ed.2d 407 (1967). Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403, provides in relevant part:

> [I]t shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of ... any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

Courts have interpreted the scope of regulatory authority embodied in section 10 as not limited to activities in navigable waters but encompassing other activities causing obstructions to navigable waters. *United States v. Sexton Cove Estates, Inc.*, 526 F.2d 1293, 1299 (5th Cir.1976). In this regard, the Corps may deny a permit on the ground the requested activity will impair navigation, or condition its approval on the applicant's agreement to comply with measures it deems appropriate for the promotion of navigation. *Kaiser Aetna v. United States*, 444 U.S. 164, 179, 100 S.Ct. 383, 392–93, 62 L.Ed.2d 332 (1979). The authority of the River and Harbors Act alone, however, does not permit the Corps to require public access to a particular body of water without paying just compensation to the owners, unless the requirement is the result of a federal navigational servitude over "interstate waters that constitute highways for commerce." *Id.* at 175, 100 S.Ct. at 390.

Having found in the instant case that the parties did not intend that the Corps-issued permit cover the dredging and filling operations within the fishpond and that the Corps's permit did not, in fact, cover such operations, the court must now determine whether the traditional doctrines regarding navigational servitudes expressed in *Kai-*

*ser Aetna* require that the lagoon be subject to a federal navigational servitude that gives the Corps the authority to require public access to the lagoon without paying the owners just compensation.

 As the *Kaiser Aetna* court noted, the question of whether a particular government action goes so far as to amount to a "taking," requiring compensation, is resolved "by engaging in essentially ad hoc, factual inquiries [that involve several factors including] the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the governmental action...." *Kaiser Aetna* 444 U.S. at 175, 100 S.Ct. at 390.

In order to resolve the questions that this instant action poses, the court must first determine whether there is an overriding federal navigational servitude that allows the Corps to require general public access to Pukoo Lagoon without compensating the Trust. As discussed in section II, *infra*, the court concludes that such a federal navigational servitude does not exist. The court must also determine whether through condition (k), the Trust's predecessor in interest, Canadian–Hawaiian, bargained away an important property right in the waters of Pukoo Lagoon—waters which became navigable waters adjacent to the area covered by the permit only after the purpose of the permit had been fulfilled.[15] As discussed in section III, *infra*, this court's determination that this was not the intent of the parties disposes of this question.

## II. *The question of the existence of a federal navigational servitude*

United States Supreme Court "cases dealing with the authority of Congress to regulate navigation and the so-called 'navigational servitude'[16] cannot simply be lumped into one basket.... '[A]ny re-

---

**15.** As this court has found *supra,* the waters of the Fishpond were not navigable in fact. It is clear that condition (k) does not apply to the pre-development, non-navigable Pūkoo Fishpond, because the pre-development fishpond cannot be construed as "navigable waters at, or adjacent to the ... work authorized by the permit."

**16.** "The navigational servitude, which exists by virtue of the Commerce Clause in navigable streams, gives rise to an authority in the Government to assure that such streams retain their capacity to serve as continuous highways for the purpose of navigation in interstate commerce." *Kaiser Aetna,* 444 U.S. at 177, 100 S.Ct. at 391.

liance upon judicial precedent must be predicated upon careful appraisal of the *purpose* for which the concept of "navigability" was invoked in a particular case.' " *Kaiser Aetna,* 444 U.S. at 170–71, 100 S.Ct. at 388 (citing *United States v. Kaiser Aetna,* 408 F.Supp. 42 at 48–49 (D.Haw.1976)). Hence, the Court has never held that "whenever a body of water satisfies [any] mechanical test, the Government may invoke the 'navigational servitude' to avoid payment of just compensation irrespective of the private interests at stake." *Id.* 444 U.S. at 179 n. 10, 100 S.Ct. at 392 n. 10.

In a posture identical to the government's in *Kaiser Aetna,* the Corps is attempting to argue that as a result of Canadian–Hawaiian's effort to connect, at considerable expense, a body of water that was private property under traditional Hawaiian law to the navigable waters of the United States, "the owner has somehow lost one of the most essential sticks in the bundle of rights that are commonly characterized as property—the right to exclude others." *Kaiser Aetna,* 444 U.S. at 176, 100 S.Ct. at 391. In terms of whether the Corps has the authority to impose a federal navigational servitude without compensation to the Trust, the instant case is indistinguishable from the Supreme Court's decision in *Kaiser Aetna.*

The body of water involved in *Kaiser Aetna* was Kuapa Pond, a privately owned Hawaiian fishpond similar to Pukoó Fishpond, which Kaiser Aetna dredged and filled in order to create what is now known as Hawaii Kai Marina. *Id.* at 166, 100 S.Ct. at 385–86. The Corps in that case argued that the development of the marina and its connection to the navigable waters of the sea so altered the character of the privately held fishpond that it became subject to an overriding federal navigational servitude that required public access to the marina. *Id.* at 170, 100 S.Ct. at 387–88. The *Kaiser Aetna* Court found that the developed Kuapa Pond constituted navigable waters for the purpose of regulation by the Corps of Engineers, but not for the purpose of im-

posing, without compensation to the owner, a federal navigational servitude requiring general public access to the marina. *Id.* at 173–74, 180, 100 S.Ct. at 388–89, 393.

In reaching its conclusion that the Corps could insist upon public access to the marina in *Kaiser Aetna* only upon payment of just compensation to the owner, the Court looked to several factors.[17] The Court determined that "prior to its improvement, Kuapa Pond was incapable of being used as a continuous highway for the purpose of navigation in interstate commerce. Its maximum depth at high tide was a mere two feet, it was separated from the adjacent bay and ocean by a natural barrier beach and its principal commercial value was limited to fishing." *Id.* at 179, 100 S.Ct. at 392. The Court then concluded that Kuapa Pond was "not the sort of 'great navigable stream' that [the] Court has previously recognized as being '[incapable] of private ownership.' " *Id.* at 179–80, 100 S.Ct. at 393 (citing *United States v. Chandler–Dunbar Co.,* 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063 (1913); *United States v. Twin City Power Co.,* 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240 (1956)). The Court further noted that Kuapa Pond "had always been considered to be private property under Hawaiian law," *id.* at 180, 100 S.Ct. at 393, and that the interest of the owners in the marina was "strikingly similar to that of owners of fast land adjacent to navigable waters." *Id.* The Court concluded that *Kaiser Aetna* was not a case in which the government exercised its regulatory power in a manner that caused "an insubstantial devaluation of private property; rather, the imposition of the navigational servitude ... [would] result in an actual physical invasion of the privately owned marina" requiring the government to pay just compensation. *Id.*

Pukoó Fishpond, prior to the development of the lagoon, similarly was not a "great navigable stream" incapable of private ownership. This court has found that the fishpond was not capable of being used as a continuous highway for the purpose of

---

17. The Court noted that it did not decide whether in some circumstances one of the factors alone may be dispositive of the issue of whether a particular action goes beyond the govern-

ment's authority to regulate and improve navigation. *Kaiser Aetna,* 444 U.S. at 179 n. 9, 100 S.Ct. at 392 n. 9.

navigation in interstate commerce. It had a maximum depth of three feet at high tide, it was separated from the Pacific by a stone wall barrier constructed by native Hawaiians decades prior to both the annexation of Hawaii as a territory of the United States and the passage of the Rivers and Harbors Appropriations Act of 1899, and its principal value was limited to commercial and recreational fishing.

Furthermore, Pukoó Fishpond, like Kuapá Pond and other Hawaiian fishponds, was considered to be private property under Hawaiian law. *Kaiser Aetna*, 444 U.S. at 179, 100 S.Ct. at 392–93.[18] Consequently, the Trust's rights with respect to the Pukoó Fishpond, both prior to and following its modification into Pukoo Lagoon, are equivalent to those of owners of fast land adjacent to navigable waters, when the government, without a corresponding improvement in navigation, takes the property without compensation.

The Corps attempts to distinguish the instant case from *Kaiser Aetna* by noting that prior to its development in the early 1800's the fishpond was clearly navigable waters; that the Corps in *Kaiser Aetna* consented to the work without requiring a permit; and that Pukoó Fishpond, unlike the naturally occurring Kuapa Pond, was man-made. The court concludes that these factual distinctions do not remove this case from the reach of the law set forth in *Kaiser Aetna* as to the issue of whether the Corps could proceed to demand a federal navigational servitude in order to secure public access to what was, and what remains private property. The Corps's argument fails to consider and credit ancient Hawaiian law and customs.

■ The Court in *Kaiser Aetna* clearly stated, without condition, that when the developer of the marina in that case had the expectation that its property would remain private after development, the Corps could not take without compensation the property interest embodied in the property owner's right to exclude others. *Id.* at

180–81, 100 S.Ct. at 393. Nothing the Corps has presented, including the purported factual distinctions set forth above, persuades this court that Canadian–Hawaiian's expectations were any different than those of Kaiser Aetna and that the lessons of *Kaiser Aetna* should not apply here. The court must and does conclude that the mere fact that the Corps has the authority to regulate Pukoo Lagoon in its now navigable state, does not vest a general right of use in the public to its waters. *See Kaiser Aetna*, 444 U.S. at 172–73, 100 S.Ct. at 388–89; *Vaughn v. Vermilion Corp.*, 444 U.S. 206, 209, 100 S.Ct. 399, 401, 62 L.Ed.2d 365 (1979).

■ Therefore, here, as in *Kaiser Aetna*, "the Government's attempt to create a public right of access to the improved pond goes far beyond ordinary regulation or improvement for navigation as to amount to a taking under the logic of *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 [, 43 S.Ct. 158, 67 L.Ed. 322] (1922)." If the government wishes to impose a right of public access, there is no doubt that it may do so. However, it must do so legitimately by condemnation proceedings through the exercise of eminent domain. *See e.g.*, 33 U.S.C. § 591 (1982) (Secretary of Army may institute condemnation proceedings to improve navigation).

## III. *The applicability of condition (k)*

■ Alternatively, the Corps contends that condition (k)[19] prohibits the Trust from now denying public access to the waters of Pukoo Lagoon in its present navigable state. The plain language of the condition suggests that if this court were to find that the waters of Pukoó Fishpond were navigable at the time of the Corps's issuance of the permit, then the Corps would be correct in its contention. Because the court has determined that the fishpond was not navigable at the time the Corps issued the permit, the court must determine whether condition (k) of the permit now applies to the waters of Pukoo Lagoon

---

**18.** For a complete and scholarly discourse on this subject *see United States v. Kaiser Aetna*, 408 F.Supp. 42, 50–52 (D.Haw.1976).

**19.** Again, condition (k) provides:

[N]o attempt shall be made by the permittee to forbid the full and free use by the public of all navigable waters at or adjacent to the … work authorized by this permit.

which, as both parties concede, became navigable after the completion of the work that the permit authorized.

The Trust argues that the only reasonable construction of condition (k) is that it merely prohibits it from interfering with the full and free use by the public of the offshore state owned waters already subject to a navigational servitude at the time the permit was issued. The weight of the evidence supports, and this court concludes that this construction of condition (k) in the context of this case is proper.

The testimony of Harold Wright and Francis Izumi clearly indicates Canadian–Hawaiian's intent to preserve the private character of the waters of Pukoó Fishpond. Moreover, condition (a) of the permit unequivocally states that the permit does not "convey any property rights either in real estate ... and ... does not authorize any injury to private property or invasion of private rights...." If the Corps argument is correct, then condition (k) creates a general public access to the private waters of Pukoo Lagoon and results in the conveyance of the right of access, a property right, from the Trust to the public in direct contravention of condition (a). Such a construction of condition (k) would be implausible in light of the Corps's admission that condition (a) in the permit was designed to protect the property rights of the permittee as well as others.

Furthermore, the Corps acknowledges that at the time it issued the permit, condition (k) was a standard condition found in virtually all permits the Corps issued. In this regard, there has been no credible evidence presented to suggest that prior to July 6, 1982, the Corps, or for that matter, representatives of the Trust or its predecessor in interest, considered condition (k) a requirement for public access to Pukoo Lagoon. The evidence does suggest that the Corps's present interpretation of condition (k) to the facts of this case was an afterthought.

This court therefore concludes based upon the evidence before it that condition (k) of the Corps issued permit does not now operate to require public access and did not operate to convey a right of public access at the time the Corps issued, and Canadian–Hawaiian accepted, the permit which is the subject of this action.

Even if condition (k) of the permit was effective in imposing a requirement upon the Trust's predecessors in interest to allow public access to the waters of Pukoo Lagoon in its now navigable state, it is not clear that the Corps acted within the constitutional bounds of its authority to impose such conditions. Although the Court in *Kaiser Aetna* indicated that the Corps may condition the approval of a dredging permit on an agreement by the permittee "to comply with various measures [that the Corps deems] appropriate for the promotion of navigation," *id.* at 180, 100 S.Ct. at 393, the Court's more recent decision in *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987) puts an increased burden on the Corps to justify its actions.

In *Nollan,* the Court indicated that a permit condition which constitutes a permanent conveyance of continuous public access to the permittee's property is not permissible unless it substantially advances a legitimate governmental interest. *Id.* at 835, 841, 107 S.Ct. at 3147, 3150. The Court particularly noted that the "substantial advancement" requirement is of particular importance in the context of a condition that requires the actual conveyance of property for "in that context there is heightened risk that the purpose is avoidance of the compensation requirement, rather than [the fulfillment of a legitimate government] objective." *Id.* at 841, 107 S.Ct. at 3150. This court cannot conclude that the imposition of condition (k) in such a manner so as to deprive the Trust of a private property interest substantially advances a legitimate government interest, even if that interest is the improvement of navigation.

## IV. *Defenses*

### A. *Statute of Limitations*

█ The Corps contends that the Trust is time barred from bringing this action. 28 U.S.C. § 2401(a) (1982) provides:

Except as provided by the Contract Disputes Act of 1978, every civil action com-

menced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues.

"A cause of action accrues, and the statute of limitations begins to run, when a plaintiff knows or has reason to know of the injury that is the basis of the action." *Pierce County Hotel Employees & Restaurant Employees Health Trust v. Elks Lodge, B.P.O.E. No. 1450*, 827 F.2d 1324, 1328 (9th Cir.1987). The assertion of the statute of limitations is an affirmative defense, Fed.R.Civ.P. 8(c), and the Corps has the burden of proving all affirmative defenses, including the raising of the statute of limitations. In the instant case, however, the government has made a prima facie showing that the suit was untimely, and as a result the Trust has the burden of proof of showing that it did not know that the government had taken a position adverse to the Trust's property rights in the lagoon until December, 1982. *See Drazan v. United States*, 762 F.2d 56 (7th Cir.1985) (once government has shown that the suit is untimely, the burden of establishing an exception to the statute of limitations is on plaintiff). *Accord Wollman v. Gross*, 637 F.2d 544, 549 (8th Cir.1980) *cert. denied* 454 U.S. 893, 102 S.Ct. 389, 70 L.Ed.2d 207 (1981); *DeWitt v. United States*, 593 F.2d 276, 281 (7th Cir.1979).

The court finds that the Trust has met its burden and has shown by a preponderance of the evidence that neither representatives of the Trust nor its predecessor in interest knew or had reason to know, even in the exercise of reasonable diligence, that the government had taken a position adverse to their property right to the exclusive use of the waters of Pukoo Lagoon prior to December 1, 1982. The court thus finds and concludes that the cause of action in this matter did not accrue until that point in time. The court makes this finding, in part, because the government has not presented any evidence which the court finds credible to rebut the Trust's showing that prior to December 1982, the Corps never communicated to the Trust or its predecessor in interest the Corps's position that Pukoo Lagoon was subject to a general public right of access. Accordingly, this

court concludes that the Trustee's filing of its complaint on June 24, 1988 was within the statute of limitations, 28 U.S.C. § 2401(a) (1982), and thus was timely.

### B. *Subject Matter Jurisdiction*

■ The Corps argues that this court has no jurisdiction to determine whether condition (k) of the permit constitutes an unconstitutional taking without compensation. The gravamen of the Corps argument is that under the jurisdiction provision of the Tucker Act, 28 U.S.C. § 1491(a) (1982), only the Claims Court can render a decision that a governmental action is void because it is a taking. Without reaching the merits of the Corps's argument, the court is not persuaded that the argument applies in this case.

It is clear that this court can determine that a governmental action is a nullity, if giving force to the action would lead to a finding that the government engaged in an uncompensated taking of private property. In this instant matter, the court concludes that condition (k) of the permit does not purport to require public access to the waters of Pukoo Lagoon, and the Corps's regulatory authority does not extend to such a degree that it may impose a right of public access over private waters without either condemnation proceedings or the clear and *lawful* imposition of a condition such as condition (k) over the waters. The court reaches this conclusion not because the Corps's action is an unauthorized taking, but because the court has found that neither the Corps nor Canadian–Hawaiian at the time the permit issued contemplated that condition (k) would cover waters which became navigable after the purpose for the permit was fulfilled, and because the Corps's attempt to impose a navigational servitude is not within its constitutional or statutory authority. This distinction confirms that this action, much like an action in which the court is required to determine the scope of a particular ambiguous clause in a contract by making a determination as to the intent of parties to the contract, is within the subject matter jurisdiction of this court. Nothing that the Corps has put forth persuades the court that such a conclusion is inappropriate.

CONCLUSION

The court finds by a preponderance of the evidence and concludes that the permit in question did not authorize dredging or filling work within Pukoó Fishpond. Furthermore, the court finds and concludes that Pukoó Fishpond was not a navigable water of the United States in its ordinary state subject to an overriding navigational servitude at the time the permit was issued.

The Trust's rights in the now navigable waters of Pukoo Lagoon have not been subject to a taking by the Corps of Engineers, for the Corps does not have the authority to extinguish the Trust's right to exclude others from the use of the lagoon unless the government proceeds to condemn the lagoon and pay just compensation to the Trust. Accordingly, the court declares that the Trust may continue to exclude the general public from the use of the lagoon.

Finally, the court finds and concludes that, based upon the intent of the parties and the language of the permit itself, condition (k) did not purport or contemplate requiring the free and full use by the general public of the waters of Pukoo Lagoon. Judgment is accordingly hereby entered in favor of the plaintiff Trustee, acting on behalf of the Trust, and against the government in accordance with this decision.[20]

Any finding of fact which may be deemed more properly a conclusion of law shall be deemed as such, and any conclusion of law which may be deemed more properly a finding of fact shall be deemed as such.

IT IS SO ORDERED.

---

**20.** The court's decision today has no impact upon state owned fast and submerged lands upon which Canadian–Hawaiian performed work at its expense pursuant to governmental permit. Thus, to the extent provided by county, state, and federal law, public access to, and use of, the two public sand beaches, the approach channel and the boat anchorage basin in Pukoo Harbor, each of which is *makai* (seaward) from the lagoon and outside the boundaries of the Trust's fee property, is not in any way affected by this decision.